44 C.C.P.A. (Customs).

**The UNITED STATES, Appellant,**

v.

**AMERICAN BITUMULS & ASPHALT CO., et al., Appellees.**

**AMERICAN BITUMULS & ASPHALT CO., et al., Appellants,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeals Nos. 4899, 4900.**

United States Court of Customs and Patent Appeals.

June 25, 1957.

George Cochran Doub, Asst. Atty. Gen., Richard E. FitzGibbon, Chief, Customs Section, New York City (Samuel D. Slade and Herman Marcuse, Washington, D. C., of counsel), for the United States.

Sharretts, Paley & Carter, New York City (Joseph F. Donohue, Washington, D. C., of counsel), for American Bitumuls & Asphalt Co., et al.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Judges.

RICH, Judge.

These are cross appeals from the decision of the United States Customs Court, First Division (C.D.1799), sustaining in part, a protest by the importer and holding that the tax or duty assessed against the merchandise, which was crude petroleum and fuel oil, should be at the rate of ⅜ cent per gallon, rather than ½ cent, as assessed by the collector. It is contended by the Government that the rate found by the collector is correct, while the importer contends that the rate should be ¼ cent per gallon or, alternatively, that it should be ⅜ cent per gallon as found by the Customs Court.

The ultimate issue to be decided here is identical with that presented to this court in 1954 and decided in United States v. Metropolitan Petroleum Corp., 42 C.C.P.A., Customs, 38, C.A.D. 567, in which we reversed the decision of the Customs Court, which there applied a rate of ¼ cent per gallon, and held the proper rate to be ½ cent per gallon. Consequently there has been much flailing of old straw because the court below saw fit not to follow our decision in the Metropolitan case, bending to the vociferous arguments of the importers that it should not be *stare decisis* because of "certain inconsistencies and anomalies in and flowing from the said decision," as stated in the lower court's opinion. Notwithstanding the importers' new approaches to the issues and the novel result reached in the elaborate opinion of the lower court, we are still of the view that the tax of ½ cent per gallon, held to be the proper rate in the Metropolitan case, is the only proper rate and we shall try to state our reasons in sufficiently clear English to avoid further misunderstanding.

The pertinent facts are as follows:

By a series of revenue acts ultimately codified as sections 3420–3422 of the Internal Revenue Code, 26 U.S.C.A. §§ 3420–3422 (approved February 10, 1939), Congress imposed a tax of ½ cent per gallon on imported crude petroleum.

The Reciprocal Trade Agreements Act of 1934 (48 Stat. 943, 19 U.S.C. §§ 1351–

1354, 19 U.S.C.A. §§ 1351–1354) added to the Tariff Act of 1930 a new Section 350 which included the following provisions:

"(a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

"(1) To enter into *foreign trade agreements* with foreign governments or instrumentalities thereof; and

"(2) *To proclaim* such modification of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate *to carry out any foreign trade agreement* that

the President has entered into hereunder. *No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists.* The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided,* That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. *The President may at any time terminate any such proclamation in whole or in part."* 48 Stat. 943. (Emphasis ours.)

By a trade agreement with Venezuela *made effective on December 16, 1939 by Presidential proclamation dated November 16, 1939* (54 Stat. 2375, 2402) the statutory tax of ½ cent per gallon on crude petroleum was reduced to ¼ cent on imports not exceeding a quota of 5 per cent of the total quantity of crude petroleum processed in the refineries of the continental United States during the preceding calendar years. As to crude petroleum in excess of that quota, the agreement did not affect the tax, which thus remained at ½ cent per gallon, the rate established by the Internal Revenue Code.

Thereafter, by a trade agreement with Mexico rendered effective on January 30, 1943 by Presidential proclamations dated December 28 and 31, 1942 (57 Stat. 833, 909) the tax was reduced to ¼ cent per gallon on *all* crude petroleum imported.

The act of July 5, 1945 (59 Stat. 410) amended part (a) (2) of paragraph 350 of the 1930 Tariff Act, quoted above, by

substituting for the second sentence thereof (which we have italicized) the following:

"No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, *however established, existing on January 1, 1945* (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists." (Emphasis ours.)

The parties agree that the "established rate of duty" on crude petroleum on January 1, 1945, within the meaning of the proviso last quoted, was the tax of ¼ cent per gallon and that the ¼ cent rate was established by the proclamation of the Mexican agreement.

On September 6, 1950, the President issued Proclamation No. 2901, the center of the present dispute, effective January 1, 1951 (64 Stat. A427, T.D. 52559) U.S. Code Cong.Service 1950, p. 1528 which contained numerous "whereas" clauses including the following:

"6. Whereas the Government of the United States has agreed with the Government of the United Mexican States that the said trade agreement shall cease to be effective after December 31, 1950;

"7. Whereas the final sentence of said section 350(a) authorizes the President of the United States to terminate in whole or in part any trade-agreement proclamation made under said section 350(a);"

"16. Whereas I determine that it is required or appropriate to carry out the said trade agreements specified in the first [General Agreement on Tariffs and Trade] and twelfth [Trade Agreement with Venezuela] recitals of this proclamation on and after January 1, 1951, that crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year in excess of an aggregate

quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year, as provided in said item 3422 set forth in the thirteenth recital of this proclamation shall be subject to import tax at the rate of ½ cent per gallon;" (Matter in brackets added).

The proclamations actually made included the following:

"Part I

\*     \*     \*     \*     \*     \*

"(b)  The said proclamations of December 28, and 31, 1942, relating to the said trade agreement with the United Mexican States, shall be terminated in whole as of the close of December 31, 1950.

\*     \*     \*     \*     \*     \*

"Part IV

"To the end that the said trade agreements specified in the first and twelfth recitals of this proclamation may be carried out, crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year beginning with the calendar year 1951, in excess of an aggregate quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year, specified in the said item 3422 set forth in the thirteenth recital of this proclamation, shall be subject to import tax at the rate of ½ cent per gallon.  \*   \*"

It has been stipulated that the tax or duty of ½ cent per gallon in the instant case was assessed by the collector under the authority of Presidential proclamation 2901, supra, and it is evident that such assessment is in accord with Part IV of that proclamation.  It is contended by the importer, however, that the proc-

lamation is invalid for the reason that it *purports* to increase by one hundred percent (from ¼ to ½ cent per gallon) the rate of duty existing on January 1, 1945. Such an increase, it is asserted, would violate paragraph (a) (2) of Section 350 of the 1930 Tariff Act as amended July 5, 1945, supra, which provides that "No proclamation" shall increase such a rate of duty by more than fifty per cent.

It is contended by the Government, on the other hand, that the words "No proclamation," when taken in context, are limited to such proclamations as give effect to a trade agreement, and do not apply to proclamations, such as the one here involved, which terminate other proclamations.

The first argument advanced in support of the Government's contention relates to the position of the words "No proclamation" in paragraph (a) (2) as amended. They appear in the second sentence of the paragraph, immediately following the statement that the President may proclaim such modifications as are required or appropriate to carry out trade agreements, and they are separated, by the generalization clause, from the sentence authorizing the President to terminate the proclamations previously referred to. The logical inference, the Government contends is that the expression "No proclamation" means no proclamation of the kind referred to in the preceding sentence.

Moreover, says the Government, the termination clause of section 350 does not specify that the termination of a proclamation is to be effected by another proclamation. Accordingly, although a terminating proclamation may, in fact, be necessary, paragraph (a) (2) seems clearly to make a distinction between a carrying-out proclamation and the termination of a proclamation, and to apply the 50 per centum limit only to the former.

It is to be noted that in paragraph (a) (2) as originally drawn the prohibition against rate changes of more than 50 per cent of "any existing rate of duty" was based on rates in existence at the time of its enactment. It was therefore impossible for the termination of *any* proclamation to effect a change of more than 50%, since the termination could do no more than restore a rate which had been legally established either by statute or by a previous proclamation and which served as the base of the 50% prohibition. At that time, therefore, there was no reason for associating the "No proclamation" provision with the *termination* of proclamations. It was only when the amendment of 1945 was made, establishing *new base rates*, that it became possible for a terminating proclamation to effect a change of more than 50 per cent of the *new base rate.*[1] If it had been the intention of Congress at that time to impose a new limitation on the terminating power, it seems reasonable to suppose that it would have done so by an express reference to that power.

The final sentence of paragraph (a) (2) of Section 350, literally construed, gives the President unqualified power to terminate *any* proclamation which he has made under that paragraph; and since it appears to be agreed by the parties that such termination cannot affect rates of duty unless it is proclaimed, it is evident that the paragraph *must* be construed as empowering the President to *proclaim* the termination of *any* proclamation, even if such termination has the effect of raising a rate 100%. It thus seems evident that the

1. This case involves the mathematical phenomenon that a reduction from ½ cent to ¼ cent is a 50% reduction while a restoration from ¼ cent to ½ cent is a 100% increase. This causes no difficulty under the language of the second sentence of paragraph (a) (2) so long as the "rate of duty" serving as the base, against which the percent of change is measured, is fixed. But when a duty resulting from a 50% decrease is established as a new base, *after* the making of the reduction, as was done by the 1945 amendment, mere restoration of the original rate is bound to be an increase of 100%. This simple arithmetical fact underlies all of the litigation in this and the Metropolitan cases.

second and fourth sentences of the paragraph cannot both be literally construed. Either the second sentence must be read as excluding proclamations which terminate other proclamations, or the fourth sentence must be read as excluding terminating proclamations which would have the effect of increasing or decreasing duties by more than 50 per cent of the 1945 rate. Under such circumstances, there must be departure from a literal interpretation in some respect and it is proper for this court to consider the probable intent of Congress in determining what is the proper interpretation.

It does not seem logical to suppose that Congress would empower the President to enter into and proclaim agreements granting lower rates of duty to foreign countries, presumably in exchange for concessions granted to the United States, and at the same time prohibit him from restoring the original rates if the agreement were terminated and the concessions to the United States withdrawn, resulting in a continuing low rate of duty on the foreign goods, with nothing received in exchange. Such an interpretation should not be placed on the statute if its language will support a more reasonable one.

There is a logical reason for placing a limitation on the tariff changes which may be effected by proclamations giving effect or carrying-out trade agreements but not on those which merely *terminate* other proclamations, since the latter can do no more than restore rates which have already been legally established, and are thus inherently limited.

The Government brief points out that there have been cases in which paragraph (a) (2) of Section 350 as amended in 1945 has been administratively interpreted to permit a change in duty by more than 50 per cent of the 1945 rate by means of a terminating proclamation and that since those cases arose Congress has repeatedly amended the Reciprocal Trade Agreements Act without indicating disapproval of such interpretations.

The same brief points out that the Trade Agreements Extension Act of 1955, a revision of the original 1934 statute, contains a provision which limits the prohibition against rate changes of more than 50 per cent of the January 1, 1945 rate to proclamations which *carry out* a foreign trade agreement, and that the Congressional committee reports with respect to that provision stated that it *"continues unchanged* the present prohibition against increasing any rate of duty to more than 50 percent above the rate existing on January 1, 1945." (Emphasis ours.) There is thus a clear indication that those who drafted the committee reports were of the opinion that the "No proclamation" limitation in the 1945 amendment of paragraph (a) (2) applied only to proclamations giving effect to trade agreements.

■ In view of the circumstances above set forth, we conclude that the prohibition contained in the second sentence of paragraph (a) (2) of Section 350 of the Tariff Act of 1930, as amended by the Act of July 5, 1945, is not applicable to proclamations which *terminate* other proclamations.

■ Part I(b) of Proclamation No. 2901 purports to terminate the proclamations which related to the Mexican trade agreement and established the rate of duty of ¼ cent per gallon for all crude petroleum imports. Considering that part to be valid and effective for its stated purpose, its effect would be to remove that agreement from the picture and to reestablish the rate of duty existing prior to the proclamation of the Mexican agreement. That rate was the ½ cent per gallon as provided for by section 3422 of the Internal Revenue Code, except that, as to crude petroleum falling *within* the 5% quota specified in the proclamation of the Venezuelan agreement, the rate was ¼ cent per gallon. The petroleum here involved was outside that quota. While the act of July 5, 1945 established the rates of duty existing on January 1, 1945 as a new base rate for the prohibition contained in the second sentence of paragraph (a) (2), it did not otherwise change the status of those rates in any respect per-

tinent here. Specifically, it did not alter the status of the tax on over-quota crude petroleum imports which had been fixed at ½ cent per gallon by the Internal Revenue Code and reduced to ¼ cent per gallon by the Mexican agreement, during the life of that agreement. It follows that Part I(b) of Proclamation No. 2901, if not invalidated by other parts of the proclamation, had the effect of restoring the rate of ½ cent per gallon as to over-quota imports.

It is evident from the portions of Proclamation No. 2901 above quoted and possibly others,[2] that its drafters were of the opinion that the termination of the proclamation of the Mexican agreement would restore in full the rates specified in Section 3422 of the Internal Revenue Code and that in order to reestablish the quota and reduced rate included in the Venezuelan agreement it was necessary to again proclaim them. As above noted, the Venezuelan agreement has no direct application to the instant case, which concerns only over-quota petroleum, but we are of the opinion that the termination of the proclamation of the Mexican agreement served to restore to full operativeness the original proclamation of the Venezuelan agreement in the same manner as it restored section 3422 of the Internal Revenue Code.

It is contended by the importer that Part IV of Proclamation No. 2901, which purports to proclaim anew the provisions of the Venezuelan proclamation, is in violation of paragraph (a) (2) of Section 350 as amended in 1945, *ultra vires*, and void since it seeks to increase a rate of duty by more than 50% of the January 1, 1945 rate. The Government urges that Part IV is merely redundant in seeking "to accomplish what already was the law" since the rates which it purports to establish are made effective by Part I(b). It is unnecessary for us to decide which of those positions is correct, since it is clear to us that, whether because of invalidity or superfluity, Part IV is ineffective to establish any rate whatever.

It remains to be considered whether the fact that Part IV of Proclamation No. 2901 is a nullity serves to render Part I(b) void. Even if we accept the importers' argument that Part IV is illegal, *ultra vires* and hence void, the test of validity of the remainder to be applied in such a case would appear to be the same as that applied in cases of partial invalidity of statutes due to unconstitutionality, namely, as stated in Allen v. Louisiana, 103 U.S. 80, 84, 26 L.Ed. 318 "whether the unconstitutional provisions are so connected with the general scope of the law as to make it impossible, if they are stricken out, to give effect to what appears to have been the intent of the legislature."

We are of the opinion, as was the Customs Court, that Parts I(b) and IV of Proclamation No. 2901 are severable. It is evident that the intention of the proclamation, so far as the involved petroleum products are concerned, was to restore the situation which had existed prior to the proclamations carrying out the Mexican trade agreement and while the Venezuelan proclamation was in full effect. In our opinion, that is exactly what was done by Part I(b) standing alone. The elimination of Part IV, therefore, clearly would not serve to render the apparent intent of Proclamation 2901 ineffective in any respect.

It seems to be contended by the importer, and to have been held by the Customs Court, that the courts cannot review the President's recited determination that Part IV of Proclamation No. 2901 was "required or appropriate to carry out" the Venezuelan trade agreement, and must therefore conclude that the said proclamation remains ineffective unless Part IV can restore it. We are unable to agree with that argument. No doubt the courts cannot substitute their discretion for that of the President in

2. Recital 15 reads as follows: "Whereas upon the termination of the said proclamation of December 31, 1942, the said item 3422 set forth in the thirteenth recital of this proclamation and the said first item 3422 set forth in the fourteenth recital hereof will become fully effective."

proclaiming trade agreements, but where, as here, the President bases his action on an incorrect interpretation of the effect of a law or proclamation, the courts are not bound to accept that interpretation as correct. We are not barred from holding that Part IV is legally ineffective for the reason that it purports to do that which had already been done by the proclamation of November 16, 1939 which carried out the Venezuelan trade agreement and which was still in force.

We agree with the Government that while the wording of Proclamation No. 2901 leaves much to be desired, the intended purpose of the proclamation, so far as it relates to the import tax on the involved petroleum products, was within the scope of the President's authority, and the valid provisions of the proclamation are sufficient to give effect to that purpose. We are accordingly of the opinion, as we were in the Metropolitan case, that the collector's assessment of a tax or duty of ½ cent per gallon on the merchandise here involved was proper.

Before concluding this consideration we should like to revert to the fact that the Customs Court, though it acknowledged that this case is, "in all material respects, similar to that which was decided by a majority of our appellate court" in the Metropolitan case, permitted itself to be persuaded not to adhere to our decision therein that the proper rate of tax is ½ cent, and to go further and evolve an entirely new tax rate of ⅜ cent. So far as we can determine from the Customs Court's opinion, the reason for this was a mistake in concluding from certain passages in the Metropolitan opinion "that our appellate court was applying to the situation and enforcing the provisions of the Venezuelan Trade Agreement *as such* and not the Presidential proclamation, issued in relation thereto." This is closely parallel to the contention in the importers' brief before us that "this court departed from the statute when it held in the Metropolitan Petroleum case * * * that the tax of ½ cent * * * be-came effective in 1951 by virtue of the provisions of the Venezuelan Trade Agreement * * *. The law did not give such force to a trade agreement alone." Both the lower court and the importers have favored us with several pages of instruction on the legal necessity of implementing trade agreements by means of proclamations. Perhaps the opinion in the Metropolitan case presumed too much on the reader's powers of observation, so we would like to point out that it refers three times directly, and several times more by inference, to the 1939 proclamation carrying out the Venezuelan trade agreement. On the whole we think it very plain that the opinion was based on the premise that the Venezuelan agreement was in effect, and remained in effect, by virtue of an unrescinded *proclamation*.

The decision of the United States Customs Court is reversed.

Reversed.

JACKSON, J., retired, recalled to participate herein in place of COLE, J., absent because of illness.

WORLEY, Judge (concurring).

My dissent in the Metropolitan case was based on the belief that the language in Section 350(a) (2) of the Tariff Act of 1930, as amended, that "No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945, * * *" was applicable to *all* proclamations.

The Metropolitan case was decided in 1954. Even before then, however, the above section appears to have been interpreted by the executive branch as not applicable to "terminating" proclamations. Since Congress has extended the Reciprocal Trade Agreements Act without indicating dissatisfaction with that interpretation, or with this court's interpretation in the Metropolitan case, I must assume they are consistent with the congressional purposes and objectives, and, accordingly, concur with the majority herein.