**ELLIS K. ORLOWITZ CO.**

v.

**UNITED STATES.**

**A.R.D. 136.**

United States Customs Court
Third Division, Appellate Term.

Oct. 23, 1961.

Sharp & Bogan, Washington, D. C.
(James R. Sharp and Raoul Berger,

Washington, D. C., of counsel), for appellant.

William H. Orrick, Jr., Asst. Atty. Gen. (Daniel I. Auster and Samuel D. Spector, trial attys., New York City), for appellee.

Before JOHNSON, DONLON, and RICHARDSON, Judges.

DONLON, Judge.

Plaintiff below seeks here the reversal of a judgment entered by Judge Lawrence, in which he affirmed the appraiser's return of values under the Antidumping Act of 1921, as amended. Ellis K. Orlowitz Co. v. United States, 43 Cust. Ct. 548, Reap.Dec. 9544. The antidumping order, under which the appraiser's return was made, was issued by the Secretary of the Treasury on October 27, 1955, T.D. 53934. The order has to do with cast-iron soil pipe imported from the United Kingdom.

While proceedings antecedent to issuance of the order were pending, certain importers of cast-iron soil pipe from the United Kingdom brought an action in the Federal Court for the District of Columbia, in which they attacked the validity of the pending proceedings and of the proposed order and the duties thereunder, and prayed for a declaratory judgment and an injunction staying the proceedings, the order, and its enforcement. The Secretary of the Treasury and the United States Tariff Commission were defendants.

Because one of the reasons the plaintiffs in that action gave for seeking an injunction was the alleged repugnance of the Antidumping Act (19 U.S.C.A. § 160) to the Constitution, a three-judge district court was convened, pursuant to section 2282 of the Judicial Code. (28 U.S.C. § 2282).

Defendants argued that the action was improperly brought in the district court, inasmuch as it was a tariff litigation and Congress has conferred on the United States Customs Court exclusive trial jurisdiction in tariff litigation. The three-judge district court sustained this contention, denied the relief plaintiffs sought, and dismissed the petition. Horton et al. v. Humphrey et al., D.C., 146 F.Supp. 819. The United States Supreme Court, after hearing, affirmed the judgment below in a brief *per curiam* opinion. Idem, 352 U.S. 921, 77 S.Ct. 224, 1 L.Ed.2d 157. That decision was handed down December 3, 1956.

There was, therefore, no decision on the merits of the issues which plaintiffs raised in the Horton action relative to the cast-iron soil pipe antidumping order, some of which are the issues that have been raised here. The attorneys who represented the plaintiffs in the Horton litigation are also the attorneys for appellant-plaintiff here.

The present action was filed pursuant to section 210 of the Antidumping Act. (19 U.S.C.A. § 169.) This is the proper procedure to test the order of the Secretary of the Treasury, and is brought in the court which has cognizance of the matter.

The appraiser returned values for "dumping" duties on certain cast-iron soil pipe from the United Kingdom, entered at the port of Philadelphia on October 5, 1954. Under date of June 6, 1955, the Philadelphia appraiser gave notice to the Commissioner of Customs (with copy to the importer, appellant-plaintiff) that appraisement of this merchandise was withheld "pending investigation as to whether or not the said merchandise is being imported in violation of the Antidumping Act of 1921." Section 201 (b) of the Antidumping Act authorizes the withholding of appraisement in such cases. (19 U.S.C.A. § 160(b).) Appraisement was made May 14, 1958, and plaintiff's appeal to reappraisement was timely filed.

On trial below, it appeared that there is no controversy as to the appraiser's finding of values under section 402 of the Tariff Act of 1930, 19 U.S.C.A. § 1401a. The sole issue is as to "dumping" values, and more particularly as to whether the "dumping" order of October 27, 1955, supra, is valid.

The basis of the claim that the order is not valid, as argued by appellant-plaintiff, is summarized in the brief filed with us in its behalf, as follows:

"1. The underlying determination by the United States Tariff Commission that 6 producers of cast-iron soil pipe in California constituted the injured industry did not satisfy the statutory requirement of a determination of injury to an 'industry', meaning the entire domestic cast-iron soil pipe industry.

"2. The Secretary's finding did not recite the required 'determination' of said Commission but substituted his own incorrect version." [Appellant's brief, pp. 1, 2.]

Judge Lawrence, trial judge below, declined to rule on the first alleged ground of invalidity, holding that the Secretary's determination of what Congress intended by the term "industry" is not a matter for judicial inquiry. As to the second ground of appeal, Judge Lawrence found that the Secretary's recital of the determination of the Tariff Commission was an adequate recital.

██ Congress can, and often does, delegate to the President, or other executive officer or agency, authority to make findings in prescribed situations, and, on the basis of such findings, to promulgate orders. This is a permissible delegation of legislative authority to the executive branch of our Government. It is axiomatic that courts are not to review the discretion exercised by the President, or other executive officer or agency, in arriving at findings in such matters. Citation of authority is not necessary to support this well-recognized rule, requiring judicial noninterference in legislative authority constitutionally conferred by Congress on the executive.

█ It is equally well established that the executive has no legislative authority save only that which Congress has conferred on it. Therefore, it is to the courts that parties must have recourse whenever they deem that they have been injured by what they regard as executive abuse of legislative power, or legislative power exercised by the executive in excess of the terms of the congressional grant.

What is involved in such cases was stated in Kleberg & Co. (Inc.) v. United States, 71 F.2d 332 at page 335, 21 CCPA 110, at page 115:

"It is equally well established by the authorities that if the Secretary of the Treasury has proceeded in the method prescribed by the Congress, we may not judicially inquire into the correctness of his conclusions. The constitutionality of the law under which he proceeds having been once determined, then the judicial power extends only to a correction of his failure to proceed according to and *within the law*." [Emphasis supplied.]

Like all general principles of law, this is a principle easier to state than to apply. It is in the application of the principle that courts encounter difficulty. While judges should refrain from reviewing executive discretion, they should be slow to deny to litigants the opportunity which our constitutional system affords for a judicial review of executive compliance with the terms laid down by the legislature, under which the delegated discretion is to be exercised.

██ There is a discernible distinction between the discretion, conferred on the executive by Congress, to find from duly presented facts that there is actual or threatened injury and the requirement, specified also by Congress, that the injury so found by the executive shall be injury to "an industry in the United States." (Sec. 201(a), Antidumping Act, 1921, as amended; 19 U.S.C.A. § 160(a).) As to the finding of injury we do not inquire. We should, however, inquire as to whether there was executive compliance with the congressional requirement that the industry found to be injured, or likely to be injured, by the "dumping" of cast-iron soil pipe, must be "an industry in the United

States." When congressional intent is not clear from statutory language, what Congress intended is a matter for judicial determination. C. J. Tower & Sons v. United States, 44 CCPA 41, C.A.D. 634.

The argument advanced by appellant is that the meaning of "industry" is so clear that no judicial construction is necessary or, indeed, permissible, because what Congress intended is self-evident; and this meaning, reenforced by administrative construction on the basis of which Congress is said to have reenacted the law, is that an industry comprises not less than all producers of a product throughout the United States.

To the contrary, we agree with appellee that the meaning of the word "industry," as Congress used it in the Antidumping Act, is not clear, and judicial scrutiny is necessary in order to ascertain what Congress did intend. We find in the record before us nothing which supports the comprehensive meaning for which appellant contends.

██ The history of the Antidumping Act, referred to *in extenso* in appellee's brief and which is matter of judicial knowledge, makes it clear that the concern of Congress was to protect the producers of the United States against actual or threatened demoralization of American markets which could result from the exportation from foreign countries of articles into the United States at prices less than the fair market value of those articles when sold for home consumption in the foreign country of exportation in usual and ordinary course. (H.Rep. No. 5, 63d Cong., 1st sess., LIII (1913), cited in appellee's brief, p. 19, 20.)

In 1913, an antidumping bill passed the House, but it did not pass the Senate. After World War I, there was renewed congressional effort to prevent the "dumping" of foreign merchandise into the commerce of the United States. It was in the Senate that the difficulties of administering antidumping duties were exposed, and the procedure was there invented by which such duties are to be laid only after a "dumping" inquiry has been conducted and a finding of injury made by the Secretary. (Now, by subsequent amendment, such findings are made by the Tariff Commission, rather than by the Secretary.)

This Senate amendment was accepted by the House. The Senate Report on the bill, cited in appellee's brief, contains the following informative comment:

"The amendment proposed in Title II relating to antidumping is a substitute for Title II of the House bill with the exception of section 214.

"The House bill made it necessary for the appraising officers to look for dumping in the case of each importation of merchandise and in the case of merchandise procured otherwise than by purchase required a bond of the importer that would obligate him to furnish the collector upon the sale of the merchandise the selling price of the merchandise and to pay any additional dumping duties that might be found due. It is the opinion of your committee that the House provision is too drastic and places too great a burden upon the administrative officers of the customs service and upon the importer. It is also the opinion of your committee that it is unnecessary to make each appraising officer look for dumping in the case of every importation and that it is unreasonable to require the various appraising officers to determine the comparability of each class of merchandise together with the foreign market value and the purchase price in each case, regardless of whether or not an industry is being injured or is likely to be injured by such importation. It is believed that the dumping of merchandise into the United States can be prevented by imposing the dumping duties upon merchandise in cases in which the Secretary, after due investigation, has instructed the appraising offi-

cers to apply the antidumping provision.

"The antidumping title of the proposed amendment is so drafted that it will apply only in cases in which the Secretary of the Treasury, through such agency or agencies as he may designate, determines that the importation of dutiable or free foreign merchandise is injuring or is likely to injure an industry in the United States and that such foreign merchandise is being sold or is likely to be sold in the United States or elsewhere at less than its fair value. It is manifest that the determination of whether or not an industry is being injured or is likely to be injured should not be placed in the hands of the individual appraising officers at the various ports of entry. See section 201 of the proposed amendment." (Senate Report 16, 67th Cong., 1st Sess., 10, (1921).

While appellant argues that the congressional intent expressed in the word "industry" is clear and unambiguous, we have found that it is not. If no other circumstance persuaded us to this conclusion (and there are others), we cannot fail to note that the Finance Committee of the Senate of the United States, in its report on the Customs Simplification Act of 1954 (3 U.S.Code Congressional and Administrative News, 1954, p. 3901), said of this very word "industry" that its meaning should be clear, indicating that it was thought not to be entirely clear in the language of the statute.

"The committee recognizes that further substantive changes in the anti-dumping law may be desirable, particularly in relation to price and injury definitions. The committee believes, for example, that *it should be clear that injury in a particular geographical area* may be sufficient for a finding of injury under the Anti-Dumping Act. Any change, however, relating to price or injury opens up a broad and difficult subject without time remaining in this session for its adequate considera-

tion. The Assistant Secretary of the Treasury has written to the committee that he believes further substantive amendments may be necessary in connection with these subjects and that the Treasury Department is giving study to these questions which may lead to suggestions for further improvement of the act." [Emphasis added.]

As a secondary, or alternative argument, appellant urges that, if the intention of Congress is not clear from the statute itself, then we are to proceed to find what the common meaning of the term "industry" is, and that the common, or ordinary, meaning of the word "industry" requires that an industry shall include all producers of the concerned product in the entire United States.

Having found, as we have, that the meaning of "industry" is not clear and unambiguous, we proceed to consider the record before us and the law.

In support of the argument that when meaning is not clear from the statute itself, courts are to resort at once to common meaning, appellant cites DeGanay v. Lederer, 250 U.S. 376, 39 S.Ct. 524, 63 L.Ed. 1042, quoting the following language:

"Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them." [p. 381, 39 S.Ct. 525.]

The question before the Court in the DeGanay case was whether income collected for plaintiff by a bank, under a power of attorney broad in scope, on stocks, bonds, and mortgages, where the bank had physical possession of the stocks, bonds, and mortgages, is income of plaintiff, a citizen of the United States resident in France, subject to Federal income tax.

The part of the opinion from which appellant has excerpted the language cited in its brief, is more fully stated as follows:

"The question submitted comes to this: Is the income from the stock, bonds, and mortgages, held by the Pennsylvania Company, derived from property owned in the United States? A learned argument is made to the effect that the stock certificates, bonds, and mortgages are not property, that they are but evidences of the ownership of interests which are property; that the property, in a legal sense, represented by the securities, would exist if the physical evidences thereof were destroyed. But we are of opinion that these refinements are not decisive of the congressional intent in using the term 'property' in this statute. Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them. To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages, and certificates of stock are regarded as property. By state and federal statutes they are often treated as property, not as mere evidences of the interest which they represent." [DeGanay, supra, at p. 380, 39 S.Ct. at p. 525.]

◼ We are not persuaded that the DeGanay case requires us to resort to common meaning in order to determine congressional intent, before reviewing legislative history. Mr. Justice Day said that *unless "the contrary appears,* statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them." [Emphasis added.] With this statement we are in accord. We are of opinion that, here, legislative history indicates what congressional intent was. Nor are we persuaded that there is any conflict between the common meaning of industry and the intention of Congress, as shown in the legislative history. While appellant argues *in extenso* what the common meaning of "industry" is, there is nothing of record on which to base the contention that the common meaning of industry is what appellant asserts it to be.

Here, we are not concerned with a tariff classification, the type of litigation in which common meaning most frequently is an issue. There is no opinion evidence in the record, and doubtless there is no need of such. The lexicographic definition cited by appellant, and other definitions, are not of much assistance to appellant's case, even if we were required to resort to them.

◼ We proceed first, then, to review the legislative history. If that history throws light on what is not clear from the statute itself, then resort to opinion evidence, lexicographic definitions, and such other aids to interpretation, is superfluous.

◼ It is axiomatic that judges do not make the law. Our duty is to ascertain what Congress intended, and to apply that intention to the facts of record in a specific case. While in general it is legislative history prior to and at the time of enactment which is most helpful in ascertaining intention, yet, we are not to ignore the legislative history in connection with subsequent congressional consideration of the legislation, incidental to modifying enactments or to reenactments.

There is legislative history that assists in ascertaining what Congress intended by the term *industry in the United States.* Some of this history antedates the enactment of the Antidumping Act in 1921. Some of it is in connection with amendments subsequently before the Congress.

What is this history? We referred, supra, to the history of the Antidumping Act prior to its enactment. After prolonged consideration of a bill that would have authorized each appraiser to find, as to each importation before him for appraisement in his own district, whether the merchandise was being "dumped," in the statutory sense, and passage of that bill by the House, there came out of the Senate a bill designed to

relieve the individual appraising officers of this administrative burden and vest authority to find the fact of "dumping" and of resultant injury in the Secretary of the Treasury (now the Tariff Commission). There was no suggestion, as we read the Senate proposal and proceedings, of intention either to limit or enlarge the concept of "injury" intended in the House bill, where the mandate was to each individual appraising officer in his own district. Mere intention to improve administration is not persuasive of an intention to change the scope of the law. The clearly expressed intention was to facilitate administration, and no intention was expressed other than to do that. This is persuasive of a legislative intention that the basic objectives were not to be changed.

That Congress thought there could be industry in the United States that might be injured by the "dumping" of foreign merchandise, less extensive geographically than nationwide, thus finds support in the legislative history.

First, the first intent was for each appraiser to determine the fact of injury as to each separate importation. An appraiser has no jurisdiction outside his own district. That is a geographical limitation. The change effected in the bill, before final passage, was to relieve the appraiser of the administrative burden of determining injury as to each importation, and to concentrate the responsibility for purposes of administrative convenience. There was careful insistence that the change was solely one of administrative convenience.

Second, in 1954, the Finance Committee of the Senate said, in a report, that "it should be clear" that injury in a particular geographical area may be sufficient for a finding of injury. (3 U.S. Code Congressional and Administrative News, supra.) The report did not say that the law should be *changed* to provide this; what was said, was that this meaning "should be clear."

Third, in 1956, with express knowledge of the cast-iron soil pipe order which is now litigated, Congress, in discussing the order, did not indicate a view that this interpretation was incorrect, as it might have done, nor did it seek to correct the administrative position by statutory enactment.

In the hearings before the Committee on Finance, United States Senate, 85th Congress, on H.R. 6006 (P.L. 85–630; T.D. 54671), an act to amend certain provisions of the Antidumping Act, 1921, to provide for greater certainty, speed, and efficiency in the enforcement thereof, the Committee was advised that:

"An example of the need for express judicial review of determination of injury by the Commission is found in the recent decision by that body involving cast-iron soil pipe. A finding of injury, under the statute, is required to be based upon the effects of imports upon 'an industry in the United States.' The Tariff Commission, in its findings in that case, reported injury to a domestic industry did exist, but seemingly found the industry concerned to consist only of producers of the involved commodity in the State of California, omitting from consideration thereof many producers in other parts of the country. * * * " [P. 111.]

The House Report, No. 1261, on H.R. 6006, stated:

"Suggestions have been advanced for the amendment of the Antidumping Act to provide for a statutory definition of 'fair value,' definition of the terms 'injury' and 'industry,' judicial review of the determinations of the Treasury Department and the Tariff Commission, Presidential review of dumping findings, etc. Consideration of these aspects of the act would involve reexamination of the basic policy issues involved in antidumping legislation. There is a wide divergence of views as to what the appropriate policy objectives of antidumping legislation should be and

how they may best be implemented. Indeed, the views expressed to your committee on these matters were often diametrically opposed. Your committee is of the opinion that these matters require careful and detailed study and that amendment of the act in these respects at this time would be premature. The amendments to the Antidumping Act contained in H.R. 6006 are of a technical nature and do not involve any change in the basic policy of the act." [P. 2.]

 Reenactment of a statutory provision, or failure to amend, after knowledge of an administrative interpretation, is persuasive of legislative acceptance that the administrative interpretation is not incorrect.

The effect of reenactment (or failure to amend), after Congress has knowledge of an administrative interpretation, is well stated in Massachusetts Mutual Life Insurance Co. v. United States, 288 U.S. 269, 273, 53 S.Ct. 337, 339, 77 L.Ed. 739, as follows:

" * * * This action [of Congress in reenacting a statute] was taken with knowledge of the construction placed upon the section by the official charged with its administration. If the legislative body had considered the Treasury interpretation erroneous, it would have amended the section. Its failure so to do requires the conclusion that the regulation was not inconsistent with the intent of the statute [citations] unless, perhaps, the language of the act is unambiguous and the regulation clearly inconsistent with it. [Citation.]"

Here, Congress knew, both in 1954 and 1956, that the Tariff Commission had construed industry to mean something less than all the producers of a product in the United States and yet did not amend the statute.

Because legislative history throws light on congressional intent; because no basis has been shown for inferring that Congress intended to limit antidumping relief to situations in which injury to every producer of a product in the nation has been shown; and, also, because there is no proof before us of the comprehensive common meaning of industry for which appellant contends; on all these grounds, we reject appellant's contention.

 It is not necessary for us to lay down a broad definition of "industry" that will be applicable to every situation. What we are under the duty of determining, and this is all we are required to decide, is whether in finding that the "dumping" of cast-iron soil pipe from Great Britain injured, or was likely to injure, the cast-iron soil pipe industry of the State of California, the Tariff Commission acted in accordance with the authority delegated to it by Congress, to determine whether there was, or was likely to be, *injury to a domestic industry in the United States*. We find that the Commission acted within its delegated authority.

 As to the second error urged by appellant in this appeal, namely, that the Secretary of the Treasury did not correctly recite, as he was required to do, the determination the Tariff Commission had reported to him, we have carefully reviewed the precedents cited in support of appellant's argument and have studied the opinion and findings of the trial judge.

We concur in his finding in this respect, which is number 8 of the findings of fact below.

We affirm the findings of fact of the trial judge, as follows:

1. The involved merchandise consists of cast-iron soil pipe, other than so-called "American pattern," exported from the United Kingdom and entered at the port of Philadelphia.

2. Appraisement of the merchandise pursuant to the provisions of section 402 of the Tariff Act of 1930 is not contested, the only question presented being the validity of the dumping order, the subject of this proceeding.

3. On July 26, 1955, the Acting Secretary of the Treasury, in accordance with section 160(a) of the Antidumping Act, 1921, as amended, advised the United States Tariff Commission that cast-iron soil pipe from the United Kingdom was being, or was likely to be, sold in the United States at less than its fair value.

4. On August 5, 1955, the Tariff Commission caused to be published in the Federal Register (20 F.R. 5667) a notice of the institution of an investigation under the Antidumping Act to determine whether an industry in the United States was being, or was likely to be, injured by reason of the importation of such merchandise into the United States.

5. On October 7, 1955, the said Commission caused to be published in the Federal Register (20 F.R. 7518) a notice that a public hearing in the said investigation would be held beginning October 21, 1955.

6. On October 21, 1955, the Tariff Commission held a public hearing.

7. On or about October 26, 1955, the said Commission notified the Secretary of the Treasury that the Commission had determined that a domestic industry in the United States was being, or was likely to be, injured by reason of the importation of cast-iron soil pipe, other than "American pattern" cast-iron soil pipe, from the United Kingdom at less than fair value.

8. On October 27, 1955, the Acting Secretary of the Treasury issued a finding of dumping (20 F.R. 8269), wherein he recited that the United States Tariff Commission had notified the Secretary of the Treasury of its determination that the industry manufacturing cast-iron soil pipe in the United States was being, or was likely to be, injured by reason of the importation into the United States of cast-iron soil pipe, other than 'American pattern' cast-iron soil pipe, from the United Kingdom.

9. On May 14, 1958, the cast-iron soil pipe was appraised pursuant to the Antidumping Act of 1921, as amended.

We conclude as a matter of law:

1. The determination of the Secretary and the Tariff Commission is not subject to judicial review as to discretionary findings, but is subject to review as to compliance with the terms of the authority delegated by the Congress.

2. The Tariff Commission and the Acting Secretary of the Treasury acted within the authority delegated by the Congress in finding that the industry injured, or likely to be injured, by the sale of cast-iron soil pipe imported from Great Britain, was an industry in the United States.

3. The appraiser's return of "foreign market value" and "purchase price," pursuant to the Antidumping Act of 1921, as amended, was made in accordance with a valid finding of dumping published by the Secretary of the Treasury in conformity with the statutory requirements.

4. The values returned by the appraiser as to "foreign market value" and "purchase price" within the provisions of the Antidumping Act of 1921, as amended, are affirmed.

5. The values returned by the appraiser pursuant to the provisions of section 402 of the Tariff Act of 1930, as amended, are also affirmed.

The judgment of the trial court is affirmed. Judgment will be entered accordingly.

JOHNSON, Judge.

I concur in the decision and judgment in this case.

While this court may not review issues, the final determination of which has been conferred by Congress exclusively upon the Secretary of the Treasury or the Tariff Commission, the validity of the action of the Secretary or other administrative official is subject to review. Kleberg & Co. (Inc.) v. United States, 71 F.2d 332, 21 CCPA 110, T.D. 46446; Waterman Steamship Corp. v. United States, 30 CCPA 119, C.A.D.223, and cases cited.

In the instant case, it is apparent that the Tariff Commission's construction of the term "industry" in the statute affects the validity of its action. Its determination that an industry in the United States was being, or was likely to be, injured related to a domestic industry consisting of the producers of cast-iron soil pipe in California. However, if the term "industry" in the statute means all the producers of a given article in the United States, the Commission's interpretation is wrong and its finding invalid.

The determination of the meaning of a word in a statute is a matter of law within the province of the courts. H. J. Heinz Company v. United States, 43 CCPA 128, 133, C.A.D. 619. The court is not bound by an incorrect interpretation of a law by an executive officer. United States v. American Bitumuls & Asphalt Co. et al., 246 F.2d 270, 44 CCPA 199, 207, C.A.D. 661, certiorari denied 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113.

In Kleberg & Co. (Inc.) v. United States, supra, the court stated that it could not investigate the facts to determine whether they justified the issuance of an antidumping order, but held that it could answer the question, "Did the Secretary exceed his authority when he construed the meaning of the words 'fair value' to be as defined in said regulation?"

Likewise, in the instant case, the court may determine whether the Tariff Commission exceeded its authority by construing the term "industry" to mean the producers in California.

I am in accord that it did not do so. It is to be noted that the statute uses the words "an industry in the United States," not the industry producing comparable merchandise, or the American industry, or the industry of the United States. The language used does not indicate a congressional intent to limit the term "industry" to the entire American industry in all cases, but rather the contrary. This is borne out by the subsequent legislative history set forth in the majority opinion.

Where merchandise is bulky or heavy and is produced in various sections of the United States, the country may well be divided into marketing areas, with producers selling primarily or exclusively to customers in their own locality. That was evidently the case in connection with cast-iron soil pipe. Under such circumstances, the producers in a particular marketing area may constitute an industry in the United States, within the meaning of the Antidumping Act. Therefore, injury or threat of injury to them is sufficient to sustain a determination that an industry in the United States was being, or was likely to be, injured by the importation of merchandise at less than fair value.

Furthermore, if a recognized segment of the domestic cast-iron soil pipe industry is being, or is likely to be, injured, there is certainly some injury to the whole industry, since the whole is the sum of its parts. If part is injured, the whole is to some extent injured, unless there is an offsetting benefit, which is not the case here.

Appellant claims that the notice issued by the Secretary of the Treasury, pursuant to section 201(a) of the Antidumping Act, did not meet the requirements of the statute and that, therefore, his finding was void. Said section provides that the Secretary of the Treasury shall make public a notice of his determination and the determination of the Tariff Commission. In the instant case, the Commission's determination was that "a domestic industry in the United States is being, or is likely to be, injured" [italic supplied] by the importation of cast-iron soil pipe from the United Kingdom at less than its fair value. The Commission's letter to the Secretary also stated:

"The domestic industry to which the Commission's determination of injury relates was held to consist of the producers of cast iron soil pipe in the State of California * * *." [Italics supplied.]

The notice, T.D. 53934, which the Secretary caused to be published stated that the Tariff Commission had notified him

"of its determination that *the* industry manufacturing cast iron soil pipe in the United States is being, or is likely to be injured." [Italics supplied.]

Evidently the Secretary construed the Commission's finding to mean that injury to the cast-iron soil pipe industry in California constituted an injury to *the* domestic industry. Thus, the notice given was not in the language used by the Tariff Commission. In view of our construction of the term "industry" in the statute, the notice is adequate. Furthermore, there is no showing that the appellant herein or anyone else was misled or prejudiced by the notice. The notice was not one given in connection with proposed rule making where the parties might not have been fully advised of the issues, but one given after a hearing at which the question of the meaning of the term "industry" had been discussed. The facts presented are not sufficient to invalidate the Secretary's finding.