MAPLE LEAF FISH
COMPANY, Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 81–10–01412.

United States Court of
International Trade.

Aug. 3, 1984.

Barnes, Richardson & Colburn, New York City (David O. Elliott, New York City, on the cross-motion; John J. Galvin, New York City, of counsel on the memoranda) for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., New York City (Michael P. Maxwell, New York City, on the motion) for defendant.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

On March 14, 1980, the American Mushroom Institute, a trade association representing domestic canners and growers of mushrooms, filed a petition for import relief with the United States International

Trade Commission (the Commission, ITC), under the provisions of section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 (1982). The ITC, on March 24, 1980, commenced an investigation to determine whether mushrooms classifiable under Item 144.20 of the Tariff Schedules of the United States (TSUS) as "[m]ushrooms, ... [o]therwise prepared or preserved" were "being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article," 19 U.S.C. § 2251(b)(1). Notice of the investigation was published in the Federal Register on April 2, 1980. *See* 45 Fed. Reg. 21,753 (1980). The Commission's investigation, which included public hearings and consideration of briefs submitted by interested parties, resulted in an affirmative determination of injury to the domestic industry as a result of increased quantities of imports. The ITC, in a report issued in August of 1980, concluded:

> On the basis of the information developed in the course of the investigation, the Commission has determined, (Commissioner Bedell not participating) that mushrooms, prepared or preserved, provided for in item 144.20 of the Tariff Schedules of the United States (TSUS), are being imported into the United States

in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.

USITC, *Report to the President on Investigation No. TA–201–43 Under Section 201 of the Trade Act of 1974*, at 1. (USITC Publication 1089 August, 1980)(hereinafter the ITC Report).

The ITC Report was transmitted to the President as required by 19 U.S.C. § 2251(d), and, on October 17, 1980, the President determined to provide import relief in the form of increased duties.[1] On October 23, 1980, a Presidential Import Relief Determination was published in the Federal Register. *See* 45 Fed.Reg. 70,361 (1980). Presidential Proclamation 4801 was issued on October 29, 1980. *See* Proclamation No. 4801, 16 *Weekly Comp. Pres. Doc.* 2610 (Oct. 29, 1980). Pursuant to the determination and proclamation, item 922.55, providing for supplemental, or cumulative, duties on imported mushrooms classifiable under item 144.20 of the TSUS, was inserted into the tariff schedules. The supplemental duties were in the form of additional ad valorem assessments of 30, 25 and 20 percent, depending upon the date of importation.

---

[1]. The ITC's Report to the President recommended that import relief action take the form of quantitative restrictions, or import quotas, for a 3-year period commencing July 1, 1980. The President, however, chose increased duties as the appropriate form of import relief action. Section 203(b)(1) of the Trade Act of 1974, 19 U.S.C. § 2253(b)(1)(1982), entitles the President to take action different from that recommended by the ITC but requires him to set forth in a document to the Congress his reasons for taking such different action. The President cited economic as well as administrative reasons for choosing tariff, rather than quota, relief.

The court notes in this regard that section 203(c)(1) of the Trade Act of 1974, 19 U.S.C. § 2253(c)(1), contains a legislative veto provision applicable where the President takes action different from that recommended by the Commission. The section authorizes the Congress, by a two-House adoption of a concurrent resolution, to disapprove the President's action and require him to act in conformity with the ITC's

recommendation. A similar one-House legislative veto provision, contained in section 242(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2)(1982), was declared unconstitutional by the Supreme Court in *INS* v. *Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The Court declared that because the legislative veto in the context of the *Chadha* case constituted an exercise of legislative power, the exercise of such power was subject to the standards of bicameralism and the presentment clause. *Id.* 103 S.Ct. at 2787; *see* U.S. Const. art. I, §§ 1, 7, cl. 2; *id.* art. I, § 7, cls. 2, 3. Because the legislative veto provision in section 203(c)(1) is not directly implicated in this case, and because the case bears several factors distinguishing it from *Chadha*, the court will not at this point pass upon the validity of section 203(c)(1). The court does this bearing in mind that any eventual infirmity would in this instance be presumed severable. *See Chadha*, 103 S.Ct. at 2775.

The plaintiff, a Canadian importer of frozen battered and breaded mushrooms, filed this action on October 14, 1981, challenging the assessment of supplemental duties insofar as frozen and battered mushrooms were concerned.

On June 21, 1983, the court issued a memorandum opinion and order denying defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. *See Maple Leaf Fish Co. v. United States,* 5 C.I.T. ——, 566 F.Supp. 899 (1983). In that opinion, the court held that subject matter jurisdiction existed under 28 U.S.C. § 1581(a) (1982), and that judicial review in this case extended to the issue of whether "the administrative action of the ITC and the President [had] been exercised in such [a] manner as to conform with the procedural requirements of statutory authority and had been performed according to law." 5 C.I.T. at ——, 566 F.Supp. at 903. The case presently is before the court on cross-motions for summary judgment.

As alluded to in the court's earlier opinion, plaintiff's claim fundamentally seeks to restrict the scope of Presidential Proclamation 4801 to include only canned mushrooms. As to the assessment of supplemental duties on frozen battered and breaded mushrooms; plaintiff contends that such action is ultra vires, illegal, and therefore void.

The plaintiff's assertions principally are grounded upon the lack of information and input to the ITC regarding frozen mushrooms. In plaintiff's view, the ITC, in its report to the President, made recommendations as to all mushrooms classifiable under item 144.20, TSUS, although the information before the agency when it made its report pertained only to canned, and not frozen, mushrooms.[2] This shortcoming, according to plaintiff, tainted the President's actions with an ultra vires quality since he was not entitled to act with respect to goods for which he had not received a report from the ITC. Plaintiff's interpretation of the scope of the ITC findings is based in large measure on the language of the ITC Report, and separate views, which, in the main, discuss canned mushrooms exclusively.

Defendant, on the other hand, points out that all of the actions taken in this matter were performed properly according to strict statutory formulae. In the defendant's view, once it is established that the ITC and the President properly adhered to the prescriptions of sections 201, 202 and 203 of the Trade Act of 1974, 19 U.S.C. §§ 2251–2253 (1982) (the escape clause provisions), judicial review should be at an end. Defendant therefore maintains that the court cannot independently evaluate the ITC's Report and the actions that were taken on the basis of the report since these considerations have been delegated by Congress to the ITC and the President and require discretionary decisionmaking unshackled by judicial review.[3] In short, defendant maintains that as long as the President received an affirmative injury report from the ITC, his action in prescribing supplemental duties for imported mushrooms was authorized by statute and could not be challenged.

In the court's opinion, it is evident that in the escape clause provisions, Congress delegated to the ITC and the President its legislative authority in a tariffmaking matter. As such, the actions of the

---

**2.** Plaintiff concedes that its imported merchandise, frozen battered and breaded mushrooms, is classifiable under Item 144.20 of the Tariff Schedules of the United States.

**3.** In support of its view regarding the relationship among the International Trade Commission (before 1975, the United States Tariff Commission), the President, and the courts, defendant relies principally on *Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933) (Cardozo, J.), which

interpreted section 315 of the Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858, 941–43 (repealed 1930). Defendant also cites *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *United States v. George S. Bush & Co.,* 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940); and *United States Cane Sugar Refiners' Ass'n v. Block,* 69 CCPA 172, 683 F.2d 399 (1982), in support of its position.

ITC and the President are reviewable only to ensure proper construction of the statutory language, compliance with procedural requisites, and whether the scope of delegated authority was exceeded. In the instant matter, the court finds that the ITC and the President acted well within these circumscriptions.

### REVIEW OF ESSENTIALLY LEGISLATIVE ACTION

That the action of the President in imposing increased duties on the imported mushrooms represents but one step in the legislative process is established by the plain import of the language of the escape clause provisions as well as its legislative history.

The Constitution, of course, commits to the legislative branch the power to regulate imports. U.S. Const. art. I. § 8, cls. 1, 3. For a period spanning virtually the life of the Republic, aspects of this power have been delegated to the Executive Branch. *See Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 308, 53 S.Ct. 350, 355, 77 L.Ed. 796 (1933). In most instances, the President is empowered to act upon his own finding of certain congressionally declared factual prerequisites. *Id.* at 309, 53 S.Ct. at 356; *see Ellis K. Orlowitz Co. v. United States*, 47 Cust. Ct. 583, 585, 200 F.Supp. 302, 305 (1961), *aff'd,* 50 CCPA 36 (1963). Under the escape clause provisions, the President is required to consider nine factors in determining whether and what method and amount of import relief to provide. 19 U.S.C. § 2252(c)(1)–(9). These considerations, however, expressly are "in addition to any other considerations ... he may deem relevant." *Id.* In addition, section 202(b)(1), 19 U.S.C. § 2252(b)(1), reveals Congress' intention that the President be granted expansive discretion in import relief decisions. Notably, this provision permits the President to decline to impose import relief if he determines "that the provision of such relief is not in the national economic interest

of the United States." *Id.* A more subjective delegation of the fact-finding function would be difficult to fathom.

The ITC has similar broad discretion. Under section 201(b)(2), 19 U.S.C. § 2251(b)(2), the ITC in making its import relief report "shall take into account *all economic factors which it considers relevant.*" *Id.* (emphasis added).

Although the sections cited above contain mandatory contemplative guidelines, "these factors do not amount to a formula for the decisionmaking process which can be judicially reviewed. Although the President must consider these factors, he has discretion to ascertain their significance and is also at liberty to consider other, possibly countervailing, factors." *Florsheim Shoe Co. v. United States*, 744 F.2d 787 at 795–96 (Fed.Cir.1984), *aff'g* 6 C.I.T. ——, 570 F.Supp. 734 (1983).

Moreover, the legislative history of the Trade Act of 1974 pertaining to the escape clause provisions is replete with references to the "flexibility" to be accorded the President and ITC in making these import relief decisions. *See* S. Rep. No. 1298, 93d Cong., 2d Sess 121, 124, 125, 126, *reprinted in* 1974 U.S. Code Cong. & Ad. News, 7186, 7265, 7268, 7269, 7270.

From the above discussion, it is clear that in the operation of the escape clause provisions as they pertain to the granting or withholding of import relief, the ITC and the President act in essentially a legislative capacity. When such is the state of events, a long line of cases, most notably *United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940), indicates that judicial review of the actions taken involves a three-pronged inquiry: (1) whether proper statutory procedures were followed; (2) whether the statutory language was properly construed; and, (3) whether the action taken was within the scope of the delegated authority. This is the *"Bush* restriction."[4] It is firmly entrenched as it pertains to judicial review of

---

4. *See Michelin Tire Corp. v. United States*, 82 Cust. Ct. 308, 332, 469 F.Supp. 270, 288–89, *appeal dismissed*, 66 CCPA 107, 603 F.2d 192 (1979); Berger, *Administrative Arbitrariness and Judicial Review*, 65 Colum. L.Rev. 55, 71 (1965).

Executive action in international trade matters. *See Florsheim Shoe Co. v. United States*, 744 F.2d 787 at 795–79€ (Fed.Cir. 1984).[5]

The court here considers the three-pronged review enunciated with favor most recently by the *Florsheim* appellate panel.[6]

## PROCEDURAL REQUIREMENTS OF STATUTORY AUTHORITY

There can be no doubt that in the conduct of the investigation and in the decision to take import relief action, the technical strictures of the Trade Act of 1974 were followed here by the Commission and the President. Sections 201, 202, and 203 are quite specific and demanding regarding time limits, publication and notice, forwarding of information and form of relief. All of these requirements were regularly followed here.

The ITC, upon receipt of the American Mushroom Institute's trade petition, duly transmitted copies to the agencies directly concerned, including the United States Trade Representative. *See* 19 U.S.C. § 2251(a)(1), (2). The ITC promptly launched its investigation and published a notice in the Federal Register. Public hearings were held over a 2-day period and interested parties were given the opportunity to present evidence. *See id.* § 2251(b)(1), (c). A report containing the ITC's findings was made to the President within 6 months of the receipt of the American Mushroom Institute's trade petition.

The President, within 60 days of his receipt of the ITC report, determined the method and amount of import relief and published the determination in the Federal Register. *See id.* § 2252(b)(1). The President then duly issued a proclamation declaring a duty increase on the threatening article. A document was transmitted to Congress by the President that set forth the actions taken by the President. This included an explanation of why the President was taking action different from that which was recommended by the ITC. *See id.* § 2253(b)(1); *supra* note 1. It is clear, then, that the proper statutory steps were followed.

## PROPER STATUTORY CONSTRUCTION AND SCOPE OF DELEGATED AUTHORITY

### A. What Constitutes the ITC's Finding?

Defendant urges that the court should only consider the first sentence of the ITC Report, denominated *"Determination of Injury,"* and appearing on page one of the Report, to be the ITC's finding of injury in this case. In part, the sentence reads "that mushrooms, prepared or preserved, provided for in item 144.20 of the Tariff Schedules of the United States (TSUS), are being imported into the United States in such increased quantities as to be a substantial cause of serious injury ... to the domestic industry." ITC Report, at 1 (footnote omitted). If the court accepts defendant's view, and deems this one sentence to con-

---

**5.** *See United States Cane Sugar Refiners' Association v. Block,* 69 CCPA 172, 177–78, 683 F.2d 399, 404 (1982); · *Montgomery Ward & Co. v. Zenith Radio Corp.,* 69 CCPA 96, 106–07, 673 F.2d 1254, 1261–62 (1982), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *City Lumber Co. v. United States,* 59 CCPA 89, 92, 457 F.2d 991, 994 (1972); *Amity Fabrics, Inc. v. United States,* 58 CCPA 73, 78, 435 F.2d 569, 573 (1970), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1667, 29 L.Ed.2d 139 (1971); *George E. Bardwil & Sons, Inc. v. United States,* 42 CCPA 118, 125 (1955); *T.M. Duche & Sons v. United States,* 39 CCPA 186, 191, *cert. denied,* 344 U.S. 830, 73 S.Ct. 35, 97 L.Ed. 646 (1952); *Twin City Milk Producers Association v. McNutt,* 122 F.2d 564, 566 (8th Cir.1941); *National Silver Co. v. United States,* 74 Cust.Ct. 18, 26 (1975).

**6.** Prior to 1980, review of executive actions taken pursuant to sections 201–203 of the Trade Act of 1974, 19 U.S.C. §§ 2251–2253 (1982), would have been available in the appropriate United States District Court. Indeed, this was part of the holding in *Sneaker Circus, Inc. v. Carter,* 566 F.2d 396 (2d Cir.1977). *See Sneaker Circus, Inc. v. Carter,* 457 F.Supp. 771 (E.D.N.Y. 1978), *aff'd mem.,* 614 F.2d 1290 (2d Cir.1979). The Customs Courts Act of 1980, Pub. L. No. 96–417, § 201, 94 Stat. 1727, 1728–29 (codified at 28 U.S.C. § 1581 (1982)), however, must be read to require that all such actions be brought in the Court of International Trade. *See Maple Leaf Fish Co. v. United States,* 5 Ct. Int'l Trade ——, ——, 566 F.Supp. 899, 902 (1983).

stitute the ITC's determination, then the President clearly was entitled to take import relief action as to frozen battered and breaded mushrooms, since this merchandise admittedly is classifiable under item 144.20. The President would have been, a fortiori, within his delegated authority, and, in addition, would have properly apprehended the statutory term "such industry," as it is used in section 202(a), 19 U.S.C. § 2252(a), as including the frozen mushroom industry. The court, however, considers the determination *and* separate views to constitute the ITC Report.

### 1. The Administrative Procedure Act

■ The Administrative Procedure Act (APA), 5 U.S.C. § 557(c)(3)(A)(1982), requires an agency to state the findings and conclusions that underlie its decisions and rulings. Administrative agencies are held to this requirement because Congress, in general, does not delegate unfettered discretion to an agency. Administrative bodies, therefore, must justify their decisions with specific and supported findings. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); *City of Rochester v. United States Environmental Protection Agency*, 496 F.Supp. 751, 765 (D.Minn. 1980).

Defendant correctly points out, though, that the APA cannot fairly be said to govern judicial review of the procedures followed by the ITC and the President under the escape clause provisions of the Trade Act of 1974. The ITC Report does not represent final agency action within APA contemplation. The Report serves merely to advise the President and carries no independent legal significance vis-a-vis individual rights.

Notwithstanding this, general principles of judicial review require that the ITC, in its section 201 Report to the President, articulate to some extent the findings that underlie its decision.

Effective judicial review would be paralyzed were an agency not required to state the reasons that prompted a particular rul-

ing. *See The Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968); *WAIT Radio v. FCC*, 418 F.2d 1153, 1156 (D.C. Cir.1969). This standard obviously is necessary for a court to conduct meaningful review of an administrative record to determine whether substantial evidence supports the agency's decision. Since the ITC Report in issue here is not subject to the substantial evidence test, it may be concluded that somewhat less articulation is required of the ITC. Nevertheless, the ITC Report must fairly apprise the President, interested parties, and the public of the reasoning underlying the recommendation. How much articulation is necessary to accomplish this will vary on a case-by-case basis conditioned by fairness under the circumstances. In *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933), the court recognized that the ITC (then the United States Tariff Commission) historically has served as a nonpartisan advisory body to the President, and that, therefore, procedures before the ITC could not be measured according to general administrative law principles. The court, nevertheless, held the ITC to an implied fairness standard in the conduct of its administrative hearings. In the Court's view, because the statute provided for hearings, the Commission was obligated to make those hearings fair. *Id.* at 321, 53 S.Ct. at 360. By the same token here, if the statute calls for an ITC Report, that Report must be fair in the sense that it be revelatory of the underlying reasoning. For these reasons, the ITC's Report and Separate Views of the Commissioners constitute the "finding" of the Commission.

### B. Did the ITC and the President Exceed Delegated Authority or Misconstrue the Statute?

The plaintiff points to language throughout the ITC Report's Separate Views of the Commissioners that repeatedly mentions the canned mushroom industry as bearing the brunt of the injury caused by increased imports. For example:

We have determined that the appropriate industry against which the impact of the subject imported articles should be weighted consists of *all domestic producers of canned mushrooms.*

ITC Report, at 6 (emphasis added). In addition, the Commission stated:

In general, the Commission has data exclusively for U.S. canning operations which enable us to analyze all factors relevant to our determination of injury. Production, consumption, sales, employment, profitability, capacity utilization, and other factors can all be examined *for canning operations alone.*

*Id.* at 14 (emphasis added).

We have found *the domestic canned mushroom industry* to be in a period of great difficulty and on the threshold of serious injury.

*Id.* at 17 (emphasis added).

Taken alone and at face value, it would indeed appear that the Commission was considering only canned, and not frozen, mushrooms in its investigation. Appearing on the first page of the Separate Views of the Commissioners, however, is footnote 1, which the court finds highly probative regarding the scope of the ITC Report. The footnote reads:

The subject imports in this case are "mushrooms, otherwise prepared or preserved," provided for at item 144.20 of the TSUS. *While this item includes mushrooms in jars and frozen mushrooms,* 97 percent of all these imports are in cans. Furthermore the vast majority of domestic production in these categories is canned as opposed to jars or frozen.

ITC Report, at 5 n.1 (emphasis added). The defendant urges, and the court must agree, that the logical inference to be drawn from this initial footnote is that the ITC intended to include jarred and frozen mushrooms in its Report to the President.

It would appear that the ITC referred to the subject imports as "canned" in the body of the Report because canned mushrooms composed 97 percent of the merchandise subject to the investigation. An additional indicator of the scope of the ITC investigation can be discerned from its Notice of Investigation published in the Federal Register. That notice specifically stated that all mushrooms classifiable under item 144.20, TSUS, were being investigated. *See* 45 Fed.Reg. 21,753 (1980). Thus, the President was within his delegated authority in imposing supplemental duties on frozen mushrooms since he had received a report from the ITC with respect to those goods. Further, the President was entitled to include the frozen mushroom industry within the scope of his import relief determination since the ITC report covered that industry.[7]

## CONCLUSION

For the above-stated reasons, this court finds that the ITC and the President followed proper statutory procedures in imposing import relief action in the form of supplemental, or cumulative, duties on mushrooms classifiable under item 144.20, TSUS, including plaintiff's imported merchandise consisting of frozen battered and breaded mushrooms. In addition, the court finds that such action neither exceeded the scope of the delegated authority nor misapplied the relevant statutes. Accordingly, defendant's motion for summary judgment is granted.

A judgment will enter accordingly.

---

**7.** It should be noted that the ITC in its report took pains to define the scope of the affected domestic industry. The principal concern was whether the fresh mushroom industry should be included within the ambit of the investigation. Fully one-third of the Report analyzes this issue.

To the court, this evinces the ITC's awareness of and sensitivity to the scope issue. The court is not convinced that, after carefully considering the definition of the relevant domestic industry, the ITC blithely dismissed the frozen segment of that industry.