**UNITED STATES CANE SUGAR REFINERS' ASSOCIATION, Appellant,**

v.

**John R. BLOCK, Secretary of Agriculture, Donald T. Regan, Secretary of the Treasury, William E. Brock, United States Trade Representative, Appellees.**

Appeal No. 82–28.

United States Court of Customs and Patent Appeals.

July 14, 1982.

Daniel F. Mayers, Daniel Marcus and William F. Marmon, Jr., of Washington, D. C., for appellant.

David M. Cohen and James R. Walczak of Washington, D. C., for appellees.

Before MARKEY, Chief Judge, and RICH, MILLER, NIES and SMITH,* Judges.

MARKEY, Chief Judge.

Appeal from a grant of summary judgment upholding the validity of Presidential Proclamation 4941, by which quotas were imposed on importation of sugar. We affirm.

## BACKGROUND

On May 5, 1982, the President issued Proclamation 4941. On May 11, 1982, the United States Cane Sugar Refiners' Association (Association) filed an action challenging its validity. On June 5, 1982, Judge Bernard Newman of the Court of International Trade granted the government's motion for summary judgment.[1] Recognizing the same need for expeditious resolution observed by Judge Newman, this court heard oral argument in special session on June 30, 1982.

### Proclamation 4941

Proclamation 4941 limits entry (or withdrawal from warehouse for consumption) of sugar to 220,000 short tons, raw value, between May 11, 1982 and June 30, 1982, and thereafter to amounts set by the Secretary of Agriculture. As authority for its promulgation, the President cited section 201 of the Trade Expansion Act of 1962 (Act), in conformity with Headnote 2, Subpart A, part 10, schedule 1, of the Tariff Schedules of the United States (TSUS), and the International Sugar Agreement, 1977, Implementation Act (P.L. 96–236, 94 Stat. 336) (ISA).[2]

---

* The Honorable Edward S. Smith, Judge of the Court of Claims, sitting by designation.

1. Association sought declaratory and injunctive relief. The government moved to dismiss because the court lacked jurisdiction, Association lacked standing, and the complaint failed to state a claim upon which relief can be granted. Recognizing the absence of factual dispute, the effect of the government's third asserted basis for dismissal, Association's acquiescence, and the rules of his court, Judge Newman deemed cross-motions for summary judgment pending and proceeded to the merits. In his Order, he denied the government's motions to dismiss, Association's application for declaratory and injunctive relief, and Association's motion for summary judgment.

2. Proclamation 4941 includes:
   NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and statutes, including section 201 of the Trade Expansion Act of 1962, section 301 of Title 3 of the United States Code, and the International Sugar Agreement, 1977, Implementation Act (P.L. 96–236, or Stat. 336), and in conformity with Headnote 2 of sub-

Under § 201(a) of the Act (19 U.S.C. § 1821(a)),[3] the President may proclaim such additional import restrictions as he may deem appropriate to carry out a trade agreement entered pursuant to section 201 between June 30, 1962 and July 1, 1967. The Proclamation cites, as such trade agreement, the Geneva (1967) Protocol of the General Agreement on Tariffs and Trade (GATT). The quota on sugar was stated to be in conformity with Headnote 2 of subpart A of part 10 of schedule 1 of TSUS, which had been added by Presidential Proclamation 3822 to the TSUS to reflect Note 1 of the Geneva Protocol.[4]

The President set forth in the Proclamation his finding that the quotas proclaimed were appropriate to carry out the trade agreement just described and the ISA, and "to give due consideration to the interests in the United States sugar market of do-mestic producers and materially affected contracting parties to the [GATT]."

*Statement by the President*

In a May 5, 1982 press release, entitled "Statement by the President," the President: described his action as proclaiming "an emergency import quota program to manage sugar imports"; referred to the action as "necessary to defend the domestic sugar support program mandated by Congress last year"; cited a cost to the government of "up to $400 million" in sugar purchases if massive imports were not prevented; reported a precipitate drop in the world sugar price to less than 9 cents a pound and the consequent inability to further defend the support program with duties and fees alone under Section 22 of the Agricultural Adjustment Act of 1933; explained the apportionment of quotas among exporting countries and the quarterly adjustment of

part A of part 10 of schedule 1 of the TSUS, do hereby proclaim until otherwise superseded by law:

Section 301 of Title 3 merely authorizes the President to delegate authority to officials of the Executive Branch.

In view of our decision, it is unnecessary to discuss whether authority for Proclamation 4941 resides in the ISA.

**3.** 19 U.S.C. § 1821(a) reads, in pertinent part:
(a) Whenever the President determines that any existing duties or other import restrictions of any foreign country or the United States are unduly burdening and restricting the foreign trade of the United States and that any of the purposes stated in section 1801 of this title will be promoted thereby, the President may—
(1) after June 30, 1962, and before July 1, 1967, enter into trade agreements with foreign countries or instrumentalities thereof; and
(2) proclaim such modification or continuance of any existing duty or other import restriction, such continuance of existing duty-free or excise treatment, or such additional import restrictions, as he determines to be required or appropriate to carry out any such trade agreement.

**4.** As set forth in Proclamation 4941:
1. Headnote 2 of subpart A of part 10 of schedule 1 of the Tariff Schedules of the United States (19 U.S.C. 1202), hereinafter referred to as the "TSUS" provides, in relevant part, as follows:

"(i) . . . if the President finds that a particular rate not lower than such January 1, 1968, rate, limited by a particular quota, may be established for any articles provided for in item 155.20 or 155.30, which will give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade, he shall proclaim such particular rate and such quota limitation. . . ."

"(ii) . . . any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate to give effect to the above considerations: . . ."

2. Headnote 2 was added to the TSUS by Proclamation No. 3822 of December 16, 1967 (82 Stat. 1455) to carry out a provision in the Geneva (1967) Protocol of the General Agreement on Tariffs and Trade (Note 1 of Unit A, Chapter 10, Part 1 of Schedule XX; 19 U.S.T., Part II, 1282). The Geneva Protocol is a trade agreement that was entered into and proclaimed pursuant to section 201(a) of the Trade Expansion Act of 1962 (19 U.S.C. 1821(a)). Section 201(a) of the Trade Expansion Act authorizes the President to proclaim the modification or continuance of any existing duty or other import restriction or such additional import restrictions as he determines to be required or appropriate to carry out any trade agreement entered into under the authority of that Act.

the total quota by the Secretary; stated that "[t]he objective is to defend the domestic support program" and avoid forfeiture of domestically produced sugar to the government, while providing foreign supplies "reasonable access to a stable, higher priced U.S. market"; and expressed solicitude for Carribean Basin countries and the Carribean Basin Initiative.

## ISSUE

█ The dispositive issue is whether the President acted within his delegated authority in issuing Proclamation 4941.[5]

## OPINION

Section 201(a) specifically authorizes the President to impose those fees and quotas on imported sugar he deems appropriate "to carry out ... any trade agreement" entered pursuant to Section 201 between June 30, 1962 and July 1, 1967. Hence Association, if it is to meet its challenger's burden, must establish that the authority on which Proclamation 4941 is premised, is not "such" a trade agreement. It is necessary in this case to tour the labyrinthine wonderland of trade agreements, TSUS provisions, presidential proclamations, and congressional enactments concerned with importation. Having done so, we conclude that the Geneva Protocol is a trade agreement under § 201 and that Note 1 is a part thereof.

During the 1949 GATT negotiations in Annecy, the United States reduced the most favored nation rate of duty on sugar and agreed that the concession there entered would be effective while Title II of the Sugar Act of 1948 or equivalent legislation was in effect.[6]

In the 1951 GATT negotiations in Torquay, this proviso was added:

*Provided,* That, if the President of the United States finds that a particular rate not lower than the rate specified above, limited by a particular quota, may be established for any product provided for in this item, which will give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties, he shall proclaim such rate and such quota limitation, to be effective not later than the 90th day following the termination of the effectiveness of such legislation: *Provided further,* That any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate to give effect to the above considerations: *And provided further,* That the provisions of this item preceding this note shall resume full effectiveness, subject to the provisions of this note, if legislation substantially equivalent to Title II of the Sugar Act of 1948 should subsequently become effective.[7]

The Geneva Protocol is dated June 30, 1967, and is thus within the agreement en-

---

5. All arguments and assertions appearing in the record have been considered, whether or not argued at the special session of this court on June 30, 1982.

We affirm the denial of the government's motion to dismiss based on lack of standing, for the reasons cited by Judge Newman, *United States Cane Sugar Refiners' Association v. Block,* ____ CIT ____, Slip Op. 82–44 (June 5, 1982). Respecting jurisdiction under § 1581(i), we note the provision of injunctive powers to the Court of International Trade in the Customs Courts Act of 1980 and the special circumstances of this case which, absent that provision, would have required Association to present its case to the District Court. We are persuaded that in this case, involving the potential for immediate injury and irreparable harm to an industry and a substantial impact on the national economy, the delay inherent in proceeding under § 1581(a) makes relief under that provision manifestly inadequate and, accordingly, the court has jurisdiction in this case under § 1581(i).

The government's motion to dismiss for failure to state a claim, and the denial of Association's motion for summary judgment, are subsumed in our affirmance of summary judgment for the government.

6. Annecy Protocol, Oct. 10, 1949, Annex A, Sched. XX, pt. I, 64 Stat. B145, at B324.

7. Torquay Protocol, Annex A, Sched. XX, p. I, item 501, 3 U.S.T. 615, at 1171. The Torquay proviso was made part of our law by Presidential Proclamation 2929 of June 2, 1951. See 86 T.D. 121, 227 (1951).

try period specified in § 201(a). It was entered as part of the "Kennedy Round" of GATT negotiations, and contained a sugar importation provision substantially identical with the Torquay proviso and designated NOTE 1, Unit A, Chapter 10, Part I, Schedule XX; 19 U.S.T., Part II, 1281. To reflect the Protocol, the language of Note 1 was added, virtually verbatim, to the TSUS by Proclamation 3822 on December 16, 1967 (82 Stat. 1455), as Headnote 2. The full text of Headnote 2, a part of which is quoted in Proclamation 4941, supra, footnote 4 is:

1. The concessions provided for in prior schedules XX in respect of articles provided for in items 155.20 and 155.30 in this unit shall be effective only during such time as title II of the Sugar Act of 1948 or substantially equivalent legislation is in effect in the United States, whether or not the quotas, or any of them, authorized by such legislation, are being applied or are suspended: *Provided,*

(i) That, if the President of the United States finds that a particular rate not lower than the rate specified in such concessions, limited by a particular quota, may be established for any product provided for in such concessions, which will give due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties, he shall proclaim such rate and such quota limitation, to be effective not later than the 90th day following the termination of the effectiveness of such legislation;

(ii) That any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate

to give effect to the above considerations; and

(iii) That the provisions of such concessions shall resume full effectiveness, subject to the provisions of this note, if legislation substantially equivalent to title II of the Sugar Act of 1948 should subsequently become effective. [Footnote omitted.]

The Sugar Act of 1948 expired in 1974.[8] Within the 90-day period specified in Headnote 2, the President proclaimed a duty and quota on sugar by Proclamation 4334 of November 16, 1974.[9] There have since been nine modifications to that duty and quota.

Thus, beginning at least as early as 1951, duties and quotas on sugar have been part and parcel of negotiations made part of our domestic law by presidential proclamation. Indeed, the very language of the Torquay proviso, "if the President . . . finds . . . limited by a particular quota . . . will give due consideration to . . . domestic producers and . . . contracting parties . . . he shall proclaim such rate and quota," is traceable without substantial change into Note 1 of the Geneva Protocol and into Headnote 2. The language of Headnote 2 quoted in Proclamation 4941 includes an authorization to modify existing quotas. Whether the President's action here at issue be viewed as the imposition of a new quota or as a modification of a quota in existence since at least 1974, it cannot be gainsaid that the President was acting within the authority delegated to him in § 201 of the Trade Expansion Act of 1962 when, in conformity with Headnote 2, he issued Proclamation 4941 to carry out the trade agreement embodied in the Geneva Protocol of the Kennedy Round, of which Note 1 as reflected in Headnote 2 is an integral part.[10]

8. Since 1974, the United States has been without a single, comprehensive sugar policy, management being conducted under one or more of the authorities present in Headnote 2, Titles II and III of the Agriculture Act of 1949 (7 U.S.C. § 1421 et seq.), Section 22 of the Agriculture Adjustment Act of 1933 (7 U.S.C. § 624), and the ISA.

9. 39 F.R. 40739, November 20, 1974. Association says presidential actions under Headnote 2

are simply intended to prevent the non-concessional rate of duty (1.9875 cents per lb.) from "snapping back." Association also says earlier quotas were non-restrictive. As indicated in the text, arguments that do not establish an absence of presidential authority to issue Proclamation 4941 are unavailing.

10. Association submitted the affidavit of Professor John H. Jackson, wherein he offered the opinion that "[t]here seems . . . to be no *inten-*

Association, pointing to the "Statement of the President" contemporaneous with Proclamation 4941, argues strenuously that the President's "real purpose" in issuing the challenged proclamation was to avoid government expenditures under the sugar price support program, and that the only authority for employing import restrictions to achieve that purpose is Section 22 of the Agriculture Adjustment Act of 1933, an authority already exhausted by imposition of duties under that section. The argument need not detain us long.

■ The President's action being authorized by the statute on which he relied, his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny. *United States v. George S. Bush & Co., Inc.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1939). Beyond the truism that an action may be multi-purposed, and the distinction between the proclamation that is in issue and the press release that is not, Association's concentration on what it insists was the President's real purpose is simply irrelevant. Grist it may be for the executive or legislative mills; grist it cannot be for the mills of the judicial branch. In sum, let the President's action be authorized, and let his action be within the authorizing provisions of

the law he cites, and the role of the judiciary is at an end.[11]

Equally untenable are Association's contentions that Proclamation 4941 is contrary to GATT and inconsistent with ISA. Concessions under GATT have traditionally included quotas as well as duties. The Geneva Protocol was not, as Association contends, limited to tariffs (duties). The Protocol itself states that negotiations were conducted pursuant to "other relevant provisions ... on ... non-tariff barriers." As above indicated, United States quotas on imported sugar have been recognized in GATT concessions since the Annecy Protocol of 1949.[12] Article 58 of ISA does not prohibit quotas, but merely requires each developed member to adopt "measures compatible with its domestic legislation as it deems appropriate" to ensure access to its market. Proclamation 4941 does ensure access, albeit limited, to the U.S. market.

## CONCLUSION

■ The President's action in promulgating Proclamation 4941 was a valid exercise of the authority provided in § 201 of the Trade Expansion Act of 1962 in conformity with Headnote 2. Accordingly, the grant of

---

*tional* reason for the inclusion of ... Note 1 in the Geneva Protocol, except for information purposes", basing his opinion on the shading of items 155.20 and 155.30 and the statement in a General Note that shaded items "facilitate an understanding of the scope of the tariff rate concessions herein" but "do not themselves describe such concessions". The statement relied upon deals with tariff rates. Note 1, which is not shaded, deals with quotas. Whatever may have been the purpose of including shaded items in Schedule XX, that purpose cannot affect the presence of Note 1 in the Geneva Protocol. In Note 1, the United States bound itself, as it had in the past, to maintain a system of sugar imports involving duties and quotas. If quotas are not established by legislation, the Note provides that the President shall establish them "not later than the 90th day following the termination of" prior legislation.

11. It is therefore unnecessary to discuss Association's several arguments based on its assertion that the purpose of Proclamation 4941 was to avoid government outlays under the sugar price support program: (1) that Section 22 is

the only possible authority for the President's action; (2) that Section 22 was foreclosed to the President because duties had been imposed and Section 22 does not permit duties *and* quotas, as set forth in *United States v. The Best Foods, Inc.*, 47 CCPA 163 (1960); and (3) that Section 22 is more specific than § 201. Nor is it necessary to discuss the countervailing arguments: (1) that § 201, in conformity with Headnote 2, supplies alternative authority, independent of that provided in Section 22; (2) that Congress has expressed its acquiescence in use of § 201 and Section 22 to impose duties and quotas, and has expressed its intent that both be used to protect the sugar price support program; and (3) that § 201 is the more specific because it deals with sugar while Section 22 deals with commodities generally.

12. Congressional reliance on that recognition is illustrated in House Ways and Means Committee Report No. 95–1484, Part II, 95th Cong., 2d Sess. 33–35.

summary judgment to the government in this case is affirmed.[13]

---

**13.** Association's concern for what it sees as increased prices to be paid by "consumers" is inappropriately expressed in the courtroom. Numerous citizens are consumers of sugar. All citizens are "consumers" of government. Whether it is more important to the nation that citizens should pay 10 cents per pound more for sugar, than it is for citizens to pay $400 million more for government, is a societal/political question the answer to which is relegated under our constitutional system to presidents and legislators, not to judges.