**AMERICAN ASSOCIATION OF EXPORTERS AND IMPORTERS—TEXTILE AND APPAREL GROUP, Plaintiff,**

v.

**UNITED STATES, et al., Defendants,**

and

**American Fiber/Textile/Apparel Coalition, Defendant-Intervenor.**

**Court No. 82–11–01581.**

United States Court of International Trade.

March 14, 1984.

Daniels, Houlihan & Palmeter, Washington, D.C. (Michael Daniels and Martin Lewin, Washington, D.C., on the motion), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., Washington, D.C. (Velta A. Melnbrencis, New York City, on the motion); (Pamela Breed, Deputy Asst. Gen. Counsel, Enforcement and Litigation, Dept. of Commerce, Washington, D.C., Mary Beth West, Attorney-Adviser, Office of the Assistant Legal Adviser for Business Economics, Dept. of State, Washington, D.C., of counsel on the memoranda), for defendants.

Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D.C. (Donald Harrison, Simeon M. Kriesberg, and Bruce G. Joseph, Washington, D.C., on the motion); Verner, Lipfert, Bernhard & McPherson (Alan Wm. Wolf, John D. Greenwald, and Ann K.H. Simon, Washington, D.C., on the motion), for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

The plaintiff in this action, a trade association representing domestic importers and retailers of textile and apparel products, has raised numerous claims relative to United States international trade policies and the authority of the President in carrying out those policies. The Association claims that its members have been seriously aggrieved by recent import restraints, or quotas, imposed by the Executive Branch of the United States Government. This suit was commenced to obtain declaratory and injunctive relief with respect to the Government's actions. The case is before the court on defendants' motion to dismiss for lack of subject matter jurisdiction, failure to exhaust administrative remedies, lack of standing, and failure to state a claim as to which relief may be granted.

## BACKGROUND

The Constitution vests in the Congress the power to regulate commerce between the United States and foreign nations. U.S. Const. art. I, § 8, cls. 1, 3. Congress, subject to certain constitutional restrictions, may delegate this power to the Chief Executive or to an administrative agency, *see California Bankers Association v. Shultz*, 416 U.S. 21, 59, 94 S.Ct. 1494, 1516, 39 L.Ed.2d 812 (1974), and indeed has done so on numerous occasions, *see, e.g.*, Trade Expansion Act of 1962, Pub.L. No. 87–794, § 232(b), 76 Stat. 872, 877 (current version at 19 U.S.C. § 1862(b) (1982)). The authorization for congressional delegation has long been recognized as inherent in our constitutional scheme, for it "enable[s] [Congress] to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as

declared by the legislature is to apply." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421, 55 S.Ct. 241, 248, 79 L.Ed. 446 (1935).

The importation of foreign-made merchandise into the commerce of the United States is, of course, particularly well suited for regulation by the Executive under a delegation from Congress. The Agricultural Act of 1956, ch. 327, § 204, 70 Stat. 188, 200 (codified as amended at 7 U.S.C. § 1854 (1982)) (the Act), represents such a delegation and is at the center of the controversy presently before the court. Section 204 of the Act, as amended, provides:

The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States of any agricultural commodity or product manufactured therefrom or textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such commodity, product, textiles, or textile products to carry out any such agreement. In addition, if a multilateral agreement has been or shall be concluded under the authority of this section among countries accounting for a significant part of world trade in the articles with respect to which the agreement was concluded, the President may also issue, in order to carry out such an agreement, regulations governing the entry or withdrawal from warehouse of the same articles which are the products of countries not parties to the agree-

ment. Nothing herein shall affect the authority provided under section 624 of this title.

7 U.S.C. § 1854 (1982). The provision authorizes the President to negotiate with foreign governments for the purpose of limiting textile imports. This authority has been exercised by the President through a network of high-level executive bodies that have the responsibility to advise and inform the President regarding textile industry conditions.

Chief among these advisory bodies is the Committee for the Implementation of Textile Agreements (CITA, the Committee), established to supervise the implementation of textile agreements reached pursuant to section 204.[1]

### The Multifiber Arrangement, or MFA

Among the textile trade agreements germane to these proceedings is the Arrangement Regarding International Trade in Textiles (Multifiber Arrangement, MFA), *done* December 20, 1973, 25 U.S.T. 1001, T.I.A.S. No. 7840 (entered into force January 1, 1974, April 1, 1974). The principal aim of the treaty is to foster greater international cooperation in textile trading. *Id.* art. 1, ¶ 2. Toward this end, article 3 of the MFA contains a consultative mechanism in the event a participating country determines that quantitative restrictions on textile imports may be warranted. Such restrictions, or quotas, properly may be invoked only if justified under provisions of the General Agreement on Tariffs and Trade (GATT), or pursuant to the market disruption standard in Annex A to the MFA.[2] The MFA was negotiated pursuant

---

**1.** The Committee for the Implementation of Textile Agreements (CITA) consists of representatives from the State, Treasury, Commerce and Labor Departments. The United States Trade Representative, or his designee, also serves on the CITA as a nonvoting member. *See* Exec. Order No. 11,651, 37 Fed.Reg. 4699 (1972).

**2.** Annex A to the Arrangement Regarding International Trade in Textiles (Multifiber Arrangement, MFA) declares that the standard of "market disruption" is to be used in determining whether import quotas are necessary. The MFA defines "market disruption" as

a sharp and substantial increase or imminent increase of imports of particular products from particular sources. Such an imminent increase shall be a measurable one and shall not be determined to exist on the basis of allegation, conjecture or mere possibility arising, for example, from the existence of production capacity in the exporting countries; these products are offered at prices which are substantially below those prevailing for similar goods of comparable quality in the market of the importing country. Such prices shall be compared both with the price for the

to the grant of authority contained in section 204 of the 1956 Act.

### The Bilateral Textile Agreements

Article 8 of the MFA embodies a pledge that measures will be taken to prevent nonparticipating countries from frustrating the goals of the MFA. In compliance, and pursuant to section 204 of the Act, the United States has entered into a series of bilateral agreements with MFA and non-MFA countries,[3] including the Agreement Relating to Trade in Cotton, Wool and Manmade Fiber Textiles and Textile Products, Sept. 17, 1980, United States-People's Republic of China, 32 U.S.T. 2071, T.I.A.S. No. 9820 (entered into force January 1, 1980). This bilateral agreement is fact-specific since it sets out categories of apparel with corresponding quantitative limits. *Id.* Annex B. Paragraph 8 of the treaty, though, applies to categories not specifically covered by the restraint levels of Annex B. This paragraph contains a consultation mecha-

nism that is tied to the "market disruption" standard of the MFA. *See supra* note 2.

### The Contested CITA Restraint Actions

The bilateral agreement between the United States and China lapsed on December 31, 1982, despite concerted efforts aimed at its continuance.[4] The United States (through the Committee), desirous of stemming the burgeoning Chinese textile tide, announced new quantitative restraint levels pursuant to the authority of section 204, and to comply with article 8 of the MFA.[5] The CITA ordered that Chinese textile imports quantitatively be restrained in thirty-three of the treaty categories. *See* 48 Fed.Reg. 2164 (1983). Additionally, during the 3-year period of the Chinese textile agreement, the CITA had requested consultations and/or imposed quantitative restraints in seventy-five other textile categories applicable to numerous supplying countries.[6]

It is these quantitative restraints and requests for consultations that plaintiff

---

domestic product at [a] comparable stage of [a] commercial transaction, and with the prices which normally prevail for such products sold in the ordinary course of trade and under open market conditions by other exporting countries in the importing country. MFA, Annex A, ¶ II(i), (ii). If a party to the MFA perceives possible market disruption, article 3 directs that party to pursue bilateral consultations and negotiations with the exporting country. In the event these consultations prove unavailing, the matter is taken up by MFA internal committees, and, ultimately, by the contracting parties to the General Agreement on Tariffs and Trade (GATT) pursuant to article XXIII of the GATT.

3. The United States currently is a party to at least 27 bilateral textile agreements with MFA and non-MFA countries. *See, e.g.,* Agreement Relating to Trade in Cotton, Wool and Manmade Fiber Textiles and Textile Products, June 23, 1982, United States-Hong Kong, T.I.A.S. No. 10,420; Agreement Relating to Trade in Cotton, Wool and Manmade Fiber Textiles and Textile Products, Dec. 1, 1982, United States-Republic of Korea; Agreement Relating to Trade in Cotton, Wool and Manmade Fiber Textiles and Textile Products, Dec. 5, 1980, United States-Malaysia, T.I.A.S. No. 10,101.

4. The United States and the People's Republic of China recently concluded a textile agreement that, in effect, reinstates the September 17, 1980

accord. *See* Agreement relating to Trade in Cotton, Wool and Manmade Fiber Textiles and Textile Products, Aug. 19, 1983, United States-People's Republic of China.

5. Section 204 of the Agricultural Act of 1956, ch. 327, 70 Stat. 188, 200, as originally enacted, did not give the President authority to control imports from countries not a party to a specific textile agreement. It later became clear that such nonparty countries could frustrate the intent of multilateral agreements by increasing exports. Congress, then, amended section 204, and granted the President authority to regulate imports from countries not a party to certain multilateral agreements. *See* Act of June 19, 1962, Pub.L. No. 87–488, 76 Stat. 104 (codified at 7 U.S.C. § 1854 (1982)). Since the MFA qualifies as a "multilateral agreement ... among countries accounting for a significant part of world trade in the articles with respect to which the agreement [refers]," 7 U.S.C. § 1854 (1982), the President's statutory authority is triggered to regulate imports of textiles from non-MFA signatories (e.g. China).

6. During the past few months, at least 59 textile categories have remained subject to quantitative restrictions. *See* Plaintiff's Response in Opposition, at 1.

challenges in the instant action. Plaintiff's principal contention vis-a-vis the invalidity of the Committee's actions concerns the findings of "market disruption" which is a prerequisite to imposing restrictions under the multi- and bilateral treaties. Plaintiff alleges the CITA found market disruption to exist (or, at least, the threat of it, *see supra* note 2) without sufficient factual data or reasoned determinations.[7] Therefore, the plaintiff contends that the Committee's actions were arbitrary, capricious, an abuse of administrative discretion, contrary to statute and the Constitution, and therefore void. Further, plaintiff objects that the CITA, by failing to provide notice and opportunity for public comment prior to making its market disruption findings, and by not making available its factual justification, violated the fifth amendment and the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1982).

Plaintiff alleges that its members have been seriously aggrieved by the CITA's actions and have suffered irreparable injury. Increased costs, additional delays, irrevocable letters of credit subject to call, and liability on contracts for resale are among the economic injuries the plaintiff alleges its members have suffered as a result of the quantitative restrictions.

Answering the substantive allegations of the complaint, defendants assert that: (1) the terms of United States international agreements are not enforceable by private parties; and, (2) the spirit of the APA has been followed since the meetings of the various senior-level advisory bodies have been open to the public and written comments have been welcomed; moreover, the "foreign affairs exception" exempts the implementation of the textile program from the strict rule-making procedures of the APA. *See* 5 U.S.C. § 553(a)(1) (1982). Defendants' motion to dismiss, however, does not go to the merits of plaintiff's claims, but, as mentioned earlier, raises four threshold questions. Defendants in the motion to dismiss assert (1) that the court lacks jurisdiction over the subject matter of this dispute; (2) that the action should be dismissed for failure to exhaust administrative remedies; (3) that the plaintiff lacks standing to bring this action; and, (4) that the complaint presents nonjusticiable issues and therefore fails to state a claim upon which relief may be granted.

## I. Subject Matter Jurisdiction & Standing

Before reaching many of the issues raised by the complaint, the court must determine whether subject matter jurisdiction exists in this case, and whether plaintiff has standing to advance its claims. The plaintiff contends jurisdiction over the subject matter exists by virtue of section 204 of the Act and 28 U.S.C. § 1581(i) (Supp. V 1981).[8] The latter provision con-

---

7. Most consultative mechanisms in the textile treaties include a requirement that detailed factual statements be offered in support of any request for consultations. In alleging that such detail was not provided in the instant matter, plaintiff relies heavily upon statements made in a Commerce Department Solicitation, No. SA–RSB–82–0011, in connection with a procurement of data from national consumer apparel interests. Plaintiff contends these statements show that the CITA acted upon inaccurate and out-of-date facts when it determined market disruption. Further, plaintiff relies on the statement of a Commerce Department official who, in a letter to plaintiff's counsel, related that available information on the domestic textile industry "too often" is inadequate.

8. 28 U.S.C. § 1581(i) (Supp. V 1981) provides in pertinent part:
   In addition to the jurisdiction conferred upon the Court of International Trade by sub-

sections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—
   (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
   (4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.
Any claim by plaintiff that subject matter jurisdiction exists pursuant to section 204 of the Agricultural Act of 1956 clearly must be rejected.

fers jurisdiction on this court in matters arising out of laws relating to "embargoes or other quantitative restrictions on the importation of merchandise." *Id.* § 1581(i)(3). Defendants, on the other hand, contend that the court properly may scrutinize this matter only under section 1581(a) after administrative protests to the United States Customs Service (Customs) have been filed and denied. *See* 28 U.S.C. § 1581(a) (Supp. V 1981). In support, the defendants claim section 1581(i) does not create any causes of action that did not exist prior to the enactment of the Customs Courts Act of 1980, Pub.L. No. 96–417, § 201, 94 Stat. 1727, 1728, and that recourse to section 1581(i) should not be permitted where it would circumvent the requirements of 1581(a).

Section 1581(i) clearly confers exclusive subject matter jurisdiction on this court in regard to the matters that plaintiff has raised in this action. The only question is when this jurisdiction is properly exercisable.

■ A few general principles bear repetition here. First, a denied protest is not an absolute precondition to the Court of International Trade's exercise of subject matter jurisdiction; "1581(i) does not require the filing or denial of a protest as a prerequisite for the exercise of jurisdiction by this court." *Wear Me Apparel Corp. v. United States,* 1 CIT 194, 196, 511 F.Supp. 814, 817 (1981). This proposition is supported by 28 U.S.C. § 2637(d) (Supp. V 1981), which states the court shall require exhaustion of administrative remedies (*i.e.* the filing and denial of a protest) *"where appropriate." Id.* (emphasis added). Although the cases relating to import quotas have not as yet offered a clear delineation as to when the court must require exhaustion of administrative remedies, it is never-

theless clear that these decisions have sustained jurisdiction in strong terms.[9]

In *United States Cane Sugar Refiners' Association v. Block,* 3 CIT 196, 544 F.Supp. 883, *aff'd.* 69 CCPA ——, 683 F.2d 399 (1982), the plaintiff was challenging a Presidential Proclamation that imposed quotas on sugar imports. The defendants moved to dismiss for lack of subject matter jurisdiction since no protest had been filed and denied by Customs. Because Customs officials would be "legally foreclosed from granting the relief sought," the court held that going through with the administrative process would be a "useless formality" and "futile." Further, regarding the defendants' assault on the court's jurisdiction, the court stated:

> It would, in my judgment, be totally unreasonable—indeed, shocking—to require plaintiff's members to attempt to import over-quota sugar simply in order to obtain a protestable exclusion of the merchandise from entry under 19 U.S.C. § 1514 before seeking judicial review of the validity of the proclamation imposing the quota in a suit for injunctive and declaratory relief.

3 CIT at 201, 544 F.Supp. at 887.

In *Associated Dry Goods Corp. v. United States,* 2 CIT 51, 521 F.Supp. 473 (1981), *modified,* 3 CIT 1, 533 F.Supp. 1343, *vacated as moot,* 69 CCPA ——, 682 F.2d 212 (1982), the plaintiff challenged a CITA-imposed quota on wool sweaters from China. Subject matter jurisdiction over the dispute was termed "plenary," the principle being "well settled" that the Court of International Trade "has jurisdiction to review agency action which impacts on imports." 2 CIT at 55, 57, 521 F.Supp. at 476, 478. Although the decision was vacated as moot on appeal, and therefore lacks force as precedent, the analysis nevertheless is instructive.

---

9. *See United States Cane Sugar Refiners' Ass'n v. Block,* 3 CIT 196, 201, 544 F.Supp. 883, 887 (exhaustion inappropriate where Customs officials obviously would be powerless to overturn contested actions), *aff'd,* 69 CCPA ——, 683 F.2d 399 (1982); *Wear Me Apparel Corp. v. United States,* 1 CIT 194, 196, 511 F.Supp. 814, 817 (1981) (exhaustion appropriate "[s]ave in those circumstances where equity requires otherwise"); *Sanho Collections, Ltd. v. Chasen,* 1 CIT 6, 11, 505 F.Supp. 204, 207–08 (1980) (where no protestable actions taken by Customs, exhaustion is inappropriate).

These cases reached diverse results on the merits, but were unanimous in sustaining the court's power to hear the matter. *See Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). The decisions also illustrate that exhaustion is not a strict formalistic requirement essential to subject matter jurisdiction in all cases, but, rather, a discretionary tool to be used by the court and informed by prudential considerations which include the effective enforcement of the Customs laws as well as the equities of a given situation. *See* 6A J. Moore, *Moore's Federal Practice* ¶ 57.16, at 57–161 (2d ed. 1982). Hence, at least in cases of quantitative restrictions on imports and resulting embargoes, and in light of strong precedent as well as explicit reference in section 1581(i)(3), the court holds that it possesses subject matter jurisdiction with respect to this matter.

The defendant repeatedly urges that the decision by the Court of Customs and Patent Appeals in *United States v. Uniroyal, Inc.,* 69 CCPA ——, 687 F.2d 467 (1982), dictates a contrary result on the subject matter jurisdiction issue. Nothing in *Uniroyal,* however, is at odds with the foregoing. In that case, the court noted that "Congress did not intend the Court of International Trade to have jurisdiction over appeals concerning *completed transactions when the appellant had failed to utilize an avenue for effective protest before the Customs Service.*" 69 CCPA at ——, 687 F.2d at 471 (emphasis added). Indeed, Judge Maletz reached an identical conclusion in the *Wear Me Apparel* case with respect to merchandise already subjected to agency action. *See* 1 CIT at 198, 511 F.Supp. at 818. No such completed transaction is involved in the instant matter. Moreover, the plaintiff in *Uniroyal* was proceeding solely on the basis of section 1581(i)(4), a provision which, if read overbroadly, would be disruptive to the integrity of the administrative process. Lastly, it should be noted that the Court of Customs and Patent Appeals, less than 2 months before *Uniroyal* was decided, expressly endorsed Judge Newman's sustaining of jurisdiction in the *United States.*

*Cane Sugar Refiners' Association* case, which like the instant matter, involved an import quota. The appeals court in its affirmance stated:

> We are persuaded that in this case, involving the potential for immediate injury and irreparable harm to an industry and a substantial impact on the national economy, the delay inherent in proceeding under § 1581(a) makes relief under that provision manifestly inadequate and, accordingly, the court has jurisdiction in this case under § 1581(i).

69 CCPA at —— n. 5, 683 F.2d at 402 n. 5.

As for the standing issue, plaintiff asserts a right to advance its claims pursuant to 28 U.S.C. § 2631(i) (Supp. V 1981), which reads:

> Any civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)–(h) of this section, may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5.

*Id.* Defendant claims plaintiff's grievances are insufficiently particularized, and that, as a trade association, plaintiff has not alleged injury to itself.

In *United States Cane Sugar Refiners' Association v. Block, supra,* the court ruled the plaintiff-trade association possessed standing pursuant to section 2631(i). This decision explicitly was affirmed by the Court of Customs and Patent Appeals and is controlling here. *See* 69 CCPA at —— n. 5, 683 F.2d at 402 n. 5, *aff'g* 3 CIT 196, 544 F.Supp. 883 (1982). Plaintiff has standing to sue since its members have a direct interest in purchasing the textile and apparel products in question and have entered into contractual relationships based thereon. The imposition of quantitative restraints on textiles from China clearly inflicts injury in fact on the plaintiff's members since "business relationships ... could be disrupted and adversely affected by the quotas." 3 CIT at 202, 544 F.Supp. at 887. Accordingly, the

court holds that the plaintiff has standing to bring this action.

## II.   Justiciability

The plaintiff characterizes this suit as simple judicial review of administrative action. The defendants and intervenors, on the other hand, contend that this action seeks to inject the judicial branch into the United States' conduct of its foreign affairs. These respective characterizations attempt to illustrate the question of whether the complaint presents justiciable causes of action.

Whether the administration of the nation's textile policy constitutes a foreign or domestic affairs function is unclear. Elements of both are present. It is certain, however, that in imposing the import controls, the CITA was relying directly on section 204 of the Act. It therefore becomes apparent that the court must, at a minimum, scrutinize the statute and the actions taken under it and determine if the scope of the delegation was exceeded. To that extent, the court holds that the plaintiff presents a justiciable issue.

█ In this sensitive area of textile trade negotiations, foreign and domestic policy considerations obviously overlap. In such a case, a delegation as broad as that contained in section 204 is not uncommon and does not constitute an illegal abdication of legislative power in violation of the delegation doctrine. *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 109–10, 68 S.Ct. 431, 435–36, 92 L.Ed. 568 (1948); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 322–24, 57 S.Ct. 216, 221–22, 81 L.Ed. 255 (1936); *Field v. Clark,* 143 U.S. 649, 690–91, 12 S.Ct. 495, 504, 36 L.Ed.2d 294 (1892); *United States v. Yoshida International, Inc.,* 63 CCPA 15, 30, 526 F.2d 560, 578 (1975).

█ The only question that remains is whether the President's actions (through the CITA) were permissible pursuant to section 204. This court holds that they were.

Section 204 grants extraordinary discretion to the President in negotiating textile trade agreements and regulating textile importation. He may negotiate *"whenever* he determines such action appropriate." 7 U.S.C. ¶ 1854 (emphasis added). Both parts of section 204 are completely free from procedural requirements, a unique brand of discretion. *See Consumers Union of U.S., Inc. v. Kissinger,* 506 F.2d 136, 156 (1974) (Leventhal, J., dissenting), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2406, 44 L.Ed.2d 673 (1975). The challenged requests for consultations were taken under authority of valid international agreements. The contested 1983 import controls were taken under authority of the 1962 amendment to section 204. To the extent plaintiff calls into question what the United States views as its prerogatives under international commercial agreements, plaintiff is presenting a nonjusticiable issue. *See Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). In the latter circumstance, given the President's wide-ranging discretion in carrying out major multilateral agreements, all he need do is point to the proper authorizing provision and take action rationally related to that provision's objective. The orderly development of trade contemplated by the MFA clearly could be impeded by a sudden infusion of textile imports from China. The CITA's decision to impose quantitative restrictions on these imports is therefore permissible under section 204 "in order to carry out" the MFA. To the extent, therefore, that plaintiff contests the CITA's findings of market disruption and inquires into its reasoning, such claims are beyond proper judicial scrutiny. As the Court of Appeals stated:

> The President's action being authorized by the statute on which he relied, his motives, his reasoning, his findings of facts requiring the action, and his judgment, are immune from judicial scrutiny. . . .  In sum, let the President's action be authorized, and let his action be within the authorizing provisions of the law he cites, and the role of the judiciary is at an end.

*United States Cane Sugar Refiners' Association v. Block,* 69 CCPA ——, ——, 683

F.2d 399, 404 (1982) (citation and footnote omitted). This principle is well embedded in our law. "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts." *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 31–32, 6 L.Ed. 537 (1827) (Story, J.).

## CONCLUSION

Because the challenged requests for consultations, and the findings of fact supporting the decision to impose quantitative restrictions on textile imports present nonjusticiable issues, and because the President's actions in imposing quantitative restrictions on textile imports were authorized by and taken in accordance with statute, the defendants' motion to dismiss for failure to state a claim upon which relief can be granted is hereby granted.[10]

So ordered.

---

**10.** Since the complaint is being dismissed as a matter of law because the President's (through the CITA) actions in imposing quantitative restrictions were authorized by statute and because the reasoning behind his determinations in imposing import quotas and requesting consultations represent issues that are nonjusticiable, further discussion of the alleged ground of dismissal for failure to exhaust administrative remedies is not required.