**AUSTRALIAN MEAT AND LIVE–STOCK CORPORATION, et al., Plaintiffs,**

**Meat Import Council of America, Inc., Intervenor-Plaintiff,**

v.

**BLOCK, et al., Defendants.**

**Court No. 84–4–00535.**

United States Court of International Trade.

June 6, 1984.

Clifford & Warnke, Paul C. Warnke, and Bryan Jay Yolles, Washington, D.C., for plaintiffs.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., and Carl J. Laurino, Jr., New York City, for intervenor-plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch and Velta A. Melnbrencis, New York City, for defendants.

Bishop, Liberman, Cook, Purcell & Reynolds, Charles R. Johnston, Jr., Joseph Tasker, Jr., and Ronelle W. Adams, Washington, D.C., for amicus curiae.

### Opinion and Order

RESTANI, Judge:

In this action, plaintiffs seek a declaration that defendants may not negotiate voluntary restraint agreements concerning certain meat products that result in meat imports less than the minimum access floor contained in the Meat Import Act of 1979, Pub.L. No. 96–177, 93 Stat. 1291 (1979). Plaintiffs also seek an injunction to bar defendants from negotiating such agreements. Defendants contend that they have plenary authority to negotiate voluntary restraint agreements pursuant to the terms of the Agricultural Act of 1956 as amended, 7 U.S.C. § 1854 (1982), and that the Meat Import Act in no way limits this power. Defendants also contend that plaintiffs lack standing, the matter is not ripe for adjudication, the case poses nonjusticiable questions, and the court lacks jurisdiction over intervenor's claims.

This action is before the court on plaintiffs' motion for a preliminary injunction, and cross-motions for summary judgment, consolidated pursuant to Rule 65(a)(2). At oral argument the court ruled that the court has jurisdiction over intervenor's claim pursuant to 28 U.S.C. § 1581(i). *See United States Cane Sugar Refiners' Association v. Block*, 69 CCPA 172, 683 F.2d 399 (1982). The court reserved judgment on the standing, ripeness and justiciability of the issues presented, and on the merits of the motions.

The President may negotiate voluntary restraint agreements limiting imports to the United States pursuant to § 204 of the Agricultural Act of 1956. Section 204 provides in relevant part:

The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States [of] any agricultural commodity or product manufactured therefrom or textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such commodity, product, textiles or textile products to carry out any such agreement.

7 U.S.C. § 1854. Pursuant to this section, President Nixon delegated to the defendants in this action, the Secretary of Agriculture, the Secretary of State and the Special Representative for Trade Negotiations (now the United States Trade Representative), the authority to negotiate bilateral agreements restricting imports into the United States of the meat products at issue in this action. Executive Order 11539, 35 Fed.Reg. 10733 (1970). Since 1970 defendants have negotiated a number of voluntary restraint agreements limiting meat imports.

In 1979, Congress passed the Meat Import Act of 1979 (1979 act). The 1979 act amended the Meat Import Act of 1964 (1964 act), to restructure certain statutory limitations on imports of meat products. The 1979 act requires the Secretary of Agriculture every three months to estimate what quantity of meat products would be entered during the calendar year in the absence of import restrictions. If the Secretary's estimate is 110% or more of a statutorily determined level,[1] then paragraph (f)(1) requires that:

if there is no limitation in effect under this section for such calendar year with respect to meat articles, the President shall by proclamation limit the total quantity of meat articles which may be

---

**1.** This is referred to as the trigger level. It is actually 110% of the base quota level. The base quota level is based on annual domestic production of meat, and cow beef in particular, and is determined prior to the calendar year.

entered during such calendar year, except that no limitation imposed under this paragraph for any calendar year may be less than 1,250,000,000 pounds. Meat Import Act of 1979 § 2(f)(1).

This quantity, *i.e.*, 1,250,000,000 pounds, is referred to as the minimum access floor.

Since the 1979 act was enacted, defendants have negotiated a number of voluntary restraint agreements with meat exporting countries to prevent meat imports from reaching the trigger level. In 1983, the trigger level was less than the 1.25 billion pound minimum access floor in subsection (f)(1). Defendants negotiated bilateral agreements with Australia, New Zealand, and Canada to limit imports of meat products below the 110% trigger level. This led to total meat imports in 1983 below the minimum access floor. In 1984 the trigger level once again is less than the 1.25 billion pound minimum access floor.

Plaintiffs contend that the minimum access floor contained in the 1979 act is a statutory guarantee of market access for imports.[2] Thus plaintiffs argue that defendants have no authority to negotiate voluntary restraint agreements for less than the minimum access floor. Plaintiffs documented in detail the injuries they suffered in 1983 due to import restraints beneath the access floor. They contend that they face similar disruption this year because of the likelihood that imports will again be restrained below the minimum access level and that the current uncertainty over market access is presently damaging their business operations.

Initially the court must determine the issues of standing, ripeness and justiciability.

Plaintiffs contend that they have standing pursuant to 28 U.S.C. § 2631(i) which reads:

Any civil actions of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)–(h) of this section, may be commenced

in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5.

*Id.* Defendants contend that plaintiffs are not within the zone of interests protected by the statutes at issue, that plaintiffs' grievance is so generalized and broadly shared that the court should not hear it, and that plaintiffs have not demonstrated injury in fact.

■ The court finds plaintiffs clearly to be within the zone of interests protected by the Meat Import Act of 1979. Plaintiffs are trade associations representing meat importers and exporters as well as individual exporters whose commercial livelihood in large part depends on meat imports to the United States. The 1979 act sets statutory limits on meat imports which directly affect their business. And the legislative history makes clear that one of the objectives of the 1979 act was "[t]o provide reasonable access to the U.S. market for imported beef and veal." S.Rep. 96–465, 96th Cong., 1st Sess. 1, *reprinted in* 1979 U.S.CODE CONG. & AD.NEWS 2654, 2655 (Senate Report). For similar reasons the court finds that plaintiffs' grievances are not generalized. Plaintiffs face damage to their commercial livelihood, not merely a generalized, abstract concern for an issue. *United States Cane Sugar Refiners' Association v. Block,* 3 CIT 196, 544 F.Supp. 883 (1982), *aff'd* 69 CCPA 172, 683 F.2d 399 (1982), *American Association of Exporters and Importers—Textile and Apparel Group v. United States,* 7 CIT —, 583 F.Supp. 591 (1984), *app. pending* No. 84–1060.

The court also finds that this dispute involves injury in fact to plaintiffs traceable to the challenged action of defendants. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Defendants contend that since no import restric-

---

**2.** Plaintiffs and intervenor represent meat exporters and importers respectively. Their contentions substantially overlap and complement each other and for this opinion will be treated together.

tions are currently in effect, plaintiff cannot be suffering injury. But testimony offered by plaintiffs' witnesses clearly demonstrates present disruption to plaintiff's business based on the uncertainty over market access.[3] This disruption is directly traceable to the challenged action. If defendants cannot negotiate voluntary restraint agreements below the access floor, then plaintiffs will know that no restraint agreements like those negotiated in 1983 will limit the total market access for imports below the access floor. Plaintiffs will suffer less business disruption immediately and be able to plan better for the future.

Next defendants contend that the court should not decide this action because the action is not ripe for adjudication. In a series of cases the Supreme Court has set out the criteria governing the ripeness doctrine. *Abbot Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 68 (1967), *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), *Gardner v. Toilet Goods Association, Inc.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). The basic rationale of the doctrine

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories,* 387 U.S. 148–149, 87 S.Ct. at 1515. The court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

*Abbott, Gardner* and *Toilet Goods* all dealt with challenges to regulations of the Food and Drug Administration prior to enforcement of the regulations against private parties. In *Abbott* and *Gardner* the court held that the pre-enforcement challenge was fit for judicial decision because the regulations set out a clearly established government policy, the challenge raised a purely legal issue of Congressional intent that would not be clarified by waiting for further administrative action, and pre-enforcement review would aid in administration of the regulations by establishing the scope of the agency's regulatory authority. In both cases the court found that the regulations were concretely affecting the challenging parties by imposing substantial financial and administrative burdens.

In contrast the court found the challenge in *Toilet Goods* premature. *Toilet Goods* concerned a challenge to a discretionary regulation that authorized the agency to suspend agency certification of a company's products if that company did not give the agency adequate access to the company's products and facilities. *Toilet Goods Association, Inc.,* 387 U.S. at 161, 87 S.Ct. at 1523. The court denied pre-enforcement review because the validity of the regulation would in large part turn on how it was applied in specific factual circumstances, *e.g.,* whether a specific application furthered the purposes of the authorizing statute, whether a company's trade secrets would be adequately protected in any inspection. Also the court decided that the challenged regulation would have no concrete impact on a company until it was actually applied.

> This is not a situation in which primary conduct is affected—when contracts must be negotiated, ingredients tested or substituted, or special records compiled.... Moreover, no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection.

*Id.* at 164, 87 S.Ct. at 1524–1525.

At first glance this case bears some resemblance to *Toilet Goods.* As in *Toilet*

---

**3.** The disruption includes the difficulty Australian slaughter-houses face in determining what quantity of meat to produce, meat importers and exporters' inability to offer assured supplies of meat throughout the year, and the uncertainty exporters face over whether to seek out new markets now in the event the American market is not open to them.

*Goods,* this action challenges discretionary action. No voluntary restraint agreements are being negotiated for 1984 at this time. Defendants are not required to negotiate such agreements regardless of the level of meat imports. But on balance the court is convinced the circumstances of this action require immediate adjudication. Defendants' interpretation of their statutory authorization to negotiate agreements presents an issue fit for judicial decision. And plaintiffs have offered persuasive evidence that they are being concretely affected by defendants' interpretation.

■ Defendants have historically negotiated voluntary restraint agreements in any year that imports threaten to exceed the trigger level of the applicable Meat Import Act.[4] Moreover defendants' negotiations in 1983 establish that they interpret the Meat Import Act of 1979 to permit defendants to negotiate agreements that limit meat imports below the minimum access floor. This narrow legal issue is the sole substantive issue raised in this action. The papers in this action demonstrate that defendants adhere to their position. And the legal validity of this position will not depend on its application in particular factual circumstances.

More importantly this action is ripe for adjudication now, because if it is not reviewable under these circumstances it may never be reviewed. Defendants have historically negotiated restraint agreements on an annual basis with each agreement expiring at the end of the calendar year. If plaintiffs cannot obtain judicial review now, they must wait, at their peril, until defendants actually negotiate agreements. Plaintiffs would then have to hope meaningful judicial review could be obtained prior to the expiration of the calendar year.

Immediate review is also appropriate to avoid undue interference with the conduct of foreign affairs. Immediate review will clarify the authority of defendants to enter into binding voluntary restraint agreements. Judicial review after defendants

have negotiated agreements could seriously interfere with the delicate balance necessary in international trade negotiations.

Plaintiffs have clearly demonstrated that they are being concretely affected by the defendants' interpretation of their power. Unlike the *Toilet Goods* case, plaintiffs' primary business conduct is presently being affected. They cannot enter into contracts with certainty of being able to fulfill them. Exporters cannot intelligently manage their herds if they have no certainty of access to their largest market. These hardships are not speculative. Plaintiffs' business operations are presently being disrupted because of the uncertainty over access to the United States market.

But defendants further contend that, because no import restrictions are currently in effect, no case or controversy exists thus presenting a constitutional bar to adjudicating this action. This contention is unpersuasive. The Third Circuit faced a similar problem when a plaintiff sought to challenge an E.P.A. regulation that had been withdrawn for procedural reasons. *Dow Chemical Company v. United States Environmental Protection Agency,* 605 F.2d 673 (3d Cir.1979). The government sought to dismiss the challenge on the grounds that "there is at this time no rule extant with which Dow must comply." *Id.* at 677. The court disagreed, deciding that an actual, concrete dispute existed as to the agency's authority because the agency was clearly committed to its interpretation of its authority. The court also noted that the past application of the regulation, combined with the likelihood that it would be applied in the future, was having a present adverse impact on plaintiff. Thus the court held that an actual controversy existed and judicial review was appropriate. The same reasoning applies here.

■ Finally, defendants contend that plaintiffs' action must fail because it poses nonjusticiable questions. This contention is without merit. This action does seek to

---

**4.** The Secretary's estimates are currently below the trigger level. Plaintiffs put on evidence indicating that the estimates were incorrect and would probably be revised.

review executive action in the area of foreign affairs. And courts should be careful not to infringe on the executive branch's power to conduct foreign affairs. But it is well settled that not every action involving foreign affairs is beyond judicial review. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). This action challenges whether defendants are legally authorized to negotiate certain voluntary restraint agreements. This issue is justiciable. *American Association of Exporters and Importers,* 583 F.Supp. 591.

■ As to the merits, the success of plaintiffs' action hinges on whether defendants' power to negotiate voluntary restraint agreements concerning meat imports is limited by the minimum access floor in the Meat Import Act of 1979. Defendants contend that the power to negotiate voluntary restraint agreements is in no way limited by the minimum access floor. Defendants are the executive officers charged with administering the statute and their interpretation of their authority is entitled to some deference. *Smith-Corona Group v. United States,* 713 F.2d 1568 (Fed.Cir.1983). To determine the proper application of the 1979 act the court looks first to the statutory language. "[T]he plain meaning of a statute must prevail in the absence of legislative history clearly indicating a Congressional intent differing from that manifested by the language used." *Luggage and Leather Goods Manufacturers of America, Inc. v. United States,* 7 CIT ——, 588 F.Supp. 1413, 1424 (1984).

The controlling language here is in paragraph (f)(1) of the 1979 act. Paragraph (f)(1) reads:

If the aggregate quantity estimated before any calendar quarter by the Secretary under subsection (e)(2) is 110 percent or more of the aggregate quantity estimated by him under subsection (e)(1), and if there is no limitation in effect under this section for such calendar year with respect to meat articles, the President shall by proclamation limit the total quantity of meat articles which may be entered during such calendar year to the aggregate quantity estimated for such calendar year by the Secretary under subsection (e)(1); *except that no limitation imposed under this paragraph for any calendar year may be less than 1,250,000,000 pounds.* The President shall include in the articles subject to any limit proclaimed under this paragraph any article of meat provided for in item 107.61 of the Tariff Schedules of the United States (relating to high-quality beef specially processed into fancy cuts). (emphasis added).

The plain language restricts limitations imposed under paragraph (f)(1) to no less than 1.25 billion pounds. Plaintiffs contend that the language must be read to restrict any restraint agreements under section 204 of the Agricultural Act of 1956 so that such agreements do not prevent 1.25 billion pounds of meat from being imported.

The plain language of the statute will not support plaintiff's construction. The language of paragraph (f)(1) restricts the application of the minimum access floor to limitations imposed under this paragraph. Paragraph (f)(1) only imposes one type of limitation: a quota that the President must proclaim when the Secretary estimates that meat imports are likely to exceed the trigger level. Paragraph (f)(1), and the 1979 act as a whole, do not expressly modify or even mention defendants' power to negotiate voluntary restraint agreements. Moreover the precise language used to describe the application of the minimum access floor suggests that Congress did not intend the floor to apply generally to all import restrictions that affect meat.

Despite the plain language of the statute, plaintiffs contend that the legislative history and the statutory scheme governing import restrictions generally require a broad application of the access floor. Plaintiffs contend that the legislative history demonstrates that Congress intended the minimum access floor as an absolute guarantee of market access for meat imports, and that § 204 of the Agricultural Act of 1956 must be read *in pari materia*

with the 1979 act to give effect to Congress' intent.

The legislative history, while not entirely clear, does not demonstrate that the minimum access floor was intended as an absolute guarantee of market access. Plaintiffs point to the language in the House Report that indicates that "no limitation imposed for any calendar year may be less than 1,200,000,000 pounds [amended to 1.25 billion pounds] regardless of what the formula calls for." H.Rep. 96–238, 96th Cong., 1st Sess. 4 (1979) (House Report). Plaintiffs also rely on language that the 1979 act "guarantees the supplying nations that, regardless of the operation of the countercyclical formula, they will be provided a minimum access level to this country of 1.2 [1.25] billion pounds per year." *Id.* at 10.

These passages, read in isolation, could support plaintiffs' construction of the minimum access floor. But these passages both appear in the context of detailed discussions of the circumstances when quotas must be imposed and of the countercyclical formula that determines the trigger level for quotas. *Id.* at 4, 10. The legislative history that directly details the application of the minimum access floor nowhere indicates that the floor applies to voluntary restraint agreements. As all parties have noted, Congress was well aware that defendants frequently negotiated voluntary restraint agreements to regulate meat imports. It is difficult to believe that Congress would nowhere mention, either in the statutory language or the legislative history, its intent to modify the use of voluntary restraint agreements if it truly intended to modify that power.

Instead it appears far more likely that Congress did not intend to require defendants to negotiate voluntary restraint agree-

ments for no less than the minimum access floor. Contrary to plaintiffs' contentions, this does not make the minimum access floor a dead letter. Defendants cannot unilaterally impose voluntary restraint agreements. They must be negotiated. Meat exporting countries may choose not to voluntarily restrain imports and if they so choose they may rely on the minimum access floor to limit any quotas imposed under paragraph (f)(1) of the 1979 act.

This reading is consistent with the overall thrust of the legislative history. The legislative history makes repeated references to the need for a minimum access floor to honor the United States' commitments to its trading partners. House Report at 10 and 20 (memorandum of disapproval of President Carter accompanying veto of earlier bill modifying 1964 act), Senate Report at 10. Thus it would make sense for the minimum access floor to restrict the effect of quotas the United States imposes unilaterally on our trading partners. It would not make sense for the minimum access floor to restrict bilateral agreements negotiated between the United States and its trading partners. It would hardly serve the interests of our trading partners to restrict the United States' ability to negotiate agreements on meat imports that best serve the interests of all parties.[5]

Plaintiffs' citations to the floor debates do not demonstrate that Congress intended the minimum access floor to apply to voluntary restraint agreements. A number of comments from the floor do state that the minimum access floor is a guarantee of market access. 125 CONG.REC. 36,623 (statement of Sen. Dole), 125 CONG.REC. 32,359 (statement of Cong. Kelly). The court cannot read these general comments as demonstrating Congressional intent to

---

**5.** One comment in the House Report is arguably inconsistent with this interpretation. The report states "[t]his guarantee to our trading partners is also a guarantee to the consumer that foreign sources of supply will be maintained in good years and in bad." House Report at 10. Consumers are not absolutely assured of a specific level of imports if voluntary restraint agreements are negotiated below the access floor. But this "guarantee" could also be read as only a limited assurance that the United States will not unilaterally hold imports below the minimum access floor. Obviously consumers can never be certain that our trading partners will seek to export any specific quantity of meat to the United States.

modify defendants' power to negotiate voluntary restraint agreements under the Agricultural Act of 1956, especially when the 1956 act was not being amended or even mentioned in the debate. Other comments from the floor accurately describe the precise role of the minimum access floor, "[i]n other words, quota restrictions would not apply to the first 1.2 billion [amended to 1.25 billion] pounds of meat imported into this country." 125 CONG.REC. 32189 (statement of Cong. Frenzel).

THEREFORE IT IS ORDERED:

Plaintiffs' motion for summary judgment is denied, plaintiffs' motion for a preliminary injunction is denied. Intervenor's motion for summary judgment is denied. Defendants' motion for summary judgment is granted.